Ronald DAVIS, Petitioner–Appellant,

v.

Wayne STRACK, Superintendent, Fishkill Correctional Facility; and Dennis C. Vacco, New York State Attorney General, Respondents–Appellees.

No. 00–2286.

United States Court of Appeals, Second Circuit.

Argued April 20, 2001.

Decided Oct. 29, 2001.

Frances Gallagher, The Legal Aid Society, New York, NY, for Appellant.

Rona Feinberg, Assistant District Attorney (Morrie I. Kleinbart, Assistant District Attorney, of counsel), for Robert M. Morgenthau, District Attorney, New York County, New York, NY, for Appellee.

Before LEVAL, SACK, and SOTOMAYOR, Circuit Judges.

LEVAL, Circuit Judge:

This appeal from the denial of a writ of habeas corpus under 28 U.S.C. § 2254 by the United States District Court for the

Southern District of New York (Berman, J.) raises the question whether a trial judge's denial of a jury instruction on justification for the use of deadly force requires that the petitioner's convictions for manslaughter and second-degree criminal possession of a weapon be set aside. At his trial for murder, petitioner credibly testified that he killed to protect himself from a man who had assaulted, raped, and threatened to kill him. The New York Supreme Court, New York County, ruled that the petitioner was not entitled to a jury instruction on justification because he had failed to retreat to avoid the danger of a confrontation when he had an earlier opportunity to do so. In an opinion issued after Davis's trial, *In the Matter of Y.K.*, 87 N.Y.2d 430, 434, 639 N.Y.S.2d 1001, 663 N.E.2d 313 (1996), the New York Court of Appeals clarified that the trial judge relied on a mistaken standard in ruling that petitioner had forfeited the justification defense.

On the evidence, taken in the light most favorable to the petitioner as New York law requires, the jury could have found that (a) petitioner used deadly force because he reasonably believed this was necessary in his defense as the other person was about to use deadly force against him; (b) at the earlier time when petitioner could have withdrawn in safety, there was as yet no imminent threat of deadly force against him; and (c) when the time came that petitioner used deadly force in his defense, he reasonably believed he could no longer retreat in safety. Petitioner was accordingly entitled under New York law to a jury instruction on the defense of justification. The court's refusal to instruct the jury on justification deprived petitioner of the opportunity to have his defense to the homicide charge considered by the jury. Because it was a credible defense—one which the jury might well have accepted—the error had a profound effect on the trial, and resulted in a denial of due process under the test of *Cupp v. Naughten*, 414 U.S. 141, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973). We further find that the requirements of 28 U.S.C. § 2254(d) are satisfied and therefore remand with instructions to grant the writ with respect to the petitioner's manslaughter conviction. The denial of the writ is affirmed as to the petitioner's conviction for illegal weapon possession.

## BACKGROUND

On June 20, 1992, petitioner Ronald Davis, a twenty-three-year-old numbers runner in Harlem, fatally shot Eddie Ray Leonard, also known as "Bubblegum." Bubblegum, who was six feet tall, weighed 435 pounds, and was twenty years older than Davis, had previously robbed Davis three times at gunpoint, raped him, and recently threatened to kill him when he next saw him. Given this background, together with Bubblegum's actions at the time of their final encounter on June 20, 1992, it was entirely reasonable for Davis to believe that Bubblegum was about to assault him with deadly force.

■ The history of the relationship between Davis and Bubblegum is as follows. The evidence is presented in the light most favorable to Davis, as New York law requires it to be in evaluating whether Davis was entitled to a charge on justification. *See People v. McManus*, 67 N.Y.2d 541, 549, 505 N.Y.S.2d 43, 496 N.E.2d 202 (1986); *People v. Magliato*, 68 N.Y.2d 24, 29, 505 N.Y.S.2d 836, 496 N.E.2d 856 (1986); *People v. Torre*, 42 N.Y.2d 1036, 1037, 399 N.Y.S.2d 203, 369 N.E.2d 759 (1977). Nevertheless, we note that Davis's testimony was in almost all respects uncontested, and in several important respects corroborated.

Davis had known Bubblegum's violent reputation for a long time. He had tried to avoid Bubblegum because Bubblegum had a reputation for being "a bad guy.... Everybody knows him as a stick up kid, he is dangerous." Davis had heard that he

beat a lady with a chain and robbed her. And there was an old lady and old man he had robbed and he had stabbed the old man. He had robbed the [drug] dealers that were on the street.... They had their girlfriend with him. He had tied him up and raped the girl. He had beaten somebody up bad around his block and he had to go to the hospital. He robbed and raped a lady in his building.

Davis knew that Bubblegum used "[d]ust [phencyclidine or PCP], cocaine and dope," and said that when Bubblegum was on drugs he "would get wild and violent and go on his missions ... sticking people up in the neighborhood."

James Bluitt, who lived in Bubblegum's building, testified that Bubblegum had broken a stick over his head and assaulted him, putting Bluitt in the hospital. Bluitt subsequently went to the police and obtained orders of protection against Bubblegum. Bluitt said Bubblegum had a reputation in the community for being vicious and violent, and for carrying a gun.

Davis was first robbed by Bubblegum when he was fifteen or sixteen years old. He described the incident as follows:

One morning, I was running the numbers and I got to 146th Street, I seen a friend named Gregory [Pearce], I was talking to him. Then this guy named CC .... come up to me. He is asking me questions that I couldn't answer. He kept talking to me. He pulled out the gun and made me go into the hallway.... After he forced me into the building, we got to look in the building, then I see Bubblegum picked up grocer-

ies and carried [them] into the building.... Then they made us go upstairs.... They had the guns to us.... Both of them had a gun.... [When we got upstairs] [t]hey went and took—they went in our pocket took the money we had and made us strip.... They said "Take off your clothes." ... CC had the gun on me.... [Bubblegum's gun was pointed] at Gregory. [Davis and Gregory took their clothes off and put them] [o]n the floor.... They kept demanding more money. They thought I had more money but I didn't have any more. Bubblegum said I was lying. He told CC to shoot us.... [CC] said, "We got the money, why shoot him?" Then they was arguing. Then they left down the stairs.

Gregory Pearce, the other victim, a store manager who did not have a criminal record, also testified to those events, corroborating Davis in all material respects.

Two or three years later when Davis was about eighteen, Bubblegum robbed Davis again. Davis was walking alone on 147th Street and Saint Nicholas Avenue in the evening as darkness arrived. He testified:

[A]s soon as I turned the corner on 147th Street, Bubblegum was there.... He grabbed me by my shirt and said, "Come here, come here, little bitch." He had a gun out. He went in my pocket.... [He was pointing the gun] towards my chest.... He took the money I had in my pocket.... [After taking the money he] told me to get the fuck out of here.

Davis did not report these incidents to the police. He believed the police would be unsympathetic to a numbers runner and would do little to protect him. Also, Davis feared that if he reported the incidents Bubblegum would retaliate. After the second robbery, whenever Davis saw

Bubblegum on the street, he hid. Bubblegum was later imprisoned for robbery, and Davis did not see him for a while.[1]

In the spring of 1992, Bubblegum again robbed Davis at gunpoint, raped him, and threatened to kill him. Davis testified:

> I was on 146th Street, 518, where I usually take the numbers. I was hanging out there, drinking coffee and I had a danish. It was early in the morning.... A tall guy comes up to me and he is asking me about drugs. Did I know where to get them from. I was telling him no, I don't know. You know what I am saying.... I didn't know that person.... He kept talking to me. I was trying to walk away from him and ignore him because once I told him, no, he still kept talking to me. Then he pulled out the gun and pushed me in the hallway. When I got to the back of the hallway that is when Bubblegum came in.... [Bubblegum] said, ["T]ake him upstairs.["] [Bubblegum had a gun, and] [t]he other guy had the gun to my back. They both led me upstairs .... [t]o the top landing of the building. When it is the top landing, as soon as you step outside the door, you're outside on the roof.... They went into my pocket.... He was going through my pocket. [Bubblegum] said[,] "I know you got more money." I didn't have any more money. He made me strip. He figured I had some money in my drawers.... [Bubblegum] kicked [Davis's clothes] into the corner.... Then he sent the guy·downstairs, told him to go watch out.... When he left, Bubblegum hit me in my head with the gun.... After he hit me in my head I bent down. He took my head and slammed it into the wall.... That is when he did what he did to me.... That is when he raped me.... He stuck his penis in me ... I

> was bent down. I told you he held me against the wall.... I kept screaming, telling him "stop." I was in pain.... He said, "Shut the fuck up." He said he would treat me like one of the bitches. [Davis said he did not know how long the attack lasted, but it stopped] because somebody had opened the door downstairs and they had closed it.... I heard the door open and I heard it close. I started screaming even more, figuring somebody would come out.... I was saying "please stop." [Bubblegum was saying] ["]Shut the fuck up before I kill you.["] ... After he stopped he hit me again. I was on the floor. Then he was zipping up his pants. Then he tells me, next time he sees me he is going to kill me....

After Bubblegum left, Davis, who was bleeding, went home. Davis explained that did not report the rape because "it bothers me to talk about it.... I never told nobody, my mother, nobody." Davis then went away to Maryland for a few weeks, returning to New York on June 19, 1992, so that he could be with his family on his birthday, June 21.

On June 20, 1992, in the evening at about 9 p.m., Davis came out of a grocery store on the southwest corner of 146th Street and Amsterdam Avenue. As he talked there with a friend, he saw Bubblegum, on the same side of Amsterdam Avenue, a short distance down toward 145th Street. Bubblegum was then involved in a conversation with a man Davis did not recognize, and was kibitzing (or playing) a game of "chug-a-lug." This was the first time Davis has seen Bubblegum since the rape and death threat. Bubblegum looked in his direction, and made eye contact with Davis.

---

1. A certificate of Bubblegum's robbery conviction was introduced into evidence.

Davis was frightened. He went around the corner to get a gun for his protection. Davis went west on 146th Street to an apartment known as "The Spot," at 518 West 146th Street, where he knew someone could give him a gun. Davis testified that he got the gun "[b]ecause last time he left me he told me he was going to kill me." Davis testified that he did not intend to "go after" Bubblegum. He "just got the gun for [his] protection" because he "wasn't going to let [Bubblegum] hurt [him] again."

Davis then returned to the corner of 146th Street and Amsterdam Avenue. At first, he did not see Bubblegum, but saw the stranger who had been with Bubblegum, standing to the south of him, closer to 145th Street. Davis was afraid of the stranger because Bubblegum had twice used accomplices to hold up and rob Davis. He then spotted Bubblegum up the block on the same (west) side of Amsterdam Avenue, closer to 147th Street.

In order to distance himself, Davis crossed to the east side of Amsterdam, intending to take refuge at the apartment of his friend Gregory Reid. Reid lived in a building just north of a take-out chicken store on the northeast corner of 146th Street and Amsterdam.[2] Davis entered the vestibule and rang Reid's doorbell "[t]o get out of the street to get away from [Bubblegum]." No one answered the bell, and Davis could not get into the building without being buzzed in. Davis then looked out and saw that Bubblegum had followed him to the east side of Amsterdam and was coming his way, walking with a woman.

Davis came out of the building because he was afraid to be trapped in the vestibule. The stranger who had been with Bubblegum was now "right across the street" from Davis. Bubblegum was coming toward him from the direction of 147th Street. Davis "put [his] back against the wall right by the chicken place." Asked why he did not flee, either eastward on 146th Street or down Amsterdam toward 145th Street, Davis said that he was scared to turn his back. "I didn't want to get shot in my back. He [had] told me he was going to kill me." Davis characterized himself as "stuck." Bubblegum again made eye contact with Davis at a distance of fifteen to twenty feet. "[Bubblegum] was looking at me but was talking to [the woman]. As he got closer and closer he was looking, I am looking at him and the guy across the street—I was scared."

Bubblegum passed in front of Davis and continued a few more steps past him to the corner. When Bubblegum reached the corner, he began to turn back toward Davis, and reached with his hand toward his waist. The woman walking with him, Diane Ellen Symonette, a drug user and thief, had been trying to sell Bubblegum a telephone. She had seen Bubblegum come out of a drug spot on Amsterdam with his eyes "bugging out" and "popping out real sweats." She testified that Bubblegum "looked kind of nervous like shook up about something." Bubblegum said to her "there is something I have to take care of you know. I am going to take care of it and I still want the phone." As they arrived at the corner, just before turning,

2. Both the Magistrate Judge and District Court described Bubblegum as standing across the street from Davis when Davis first returned to 146th and Amsterdam. These courts therefore concluded that by crossing Amsterdam, Davis was moving towards Bubblegum. However, the evidence shows, and the respondents do not dispute, that when Davis came out of the Spot, Davis and Bubblegum were on the same (west) side of Amsterdam. When Davis then crossed to the east side of the Amsterdam Avenue, he was moving away from Bubblegum.

Bubblegum said to her, "I have to hit this guy off."

Davis believed that Bubblegum, who in their three prior confrontations had carried a gun, was turning to shoot him. Stricken with panic and hoping to "beat [Bubblegum] to the draw," Davis ran out to his right behind Bubblegum and shot him several times in the back. Davis then ran away down 146th Street.

It turned out that Bubblegum was armed that day not with a gun but with a carpet knife. The medical examiner testified that he had various drugs in his system, including "a fair amount of phencyclidine" (PCP). The examiner further testified that a person under the influence of PCP is often violent.

Professor Ellen Treacy, a consultant in sexual abuse, assault and child development testified that rape victims often suffer from "rape trauma syndrome," which involves fear of the offender. The fear is especially pronounced where the attacker is known to the victim and where a weapon was used or threats were made.

### I. The Jury Charge at Trial

Just before the summations were to begin, the trial judge announced that she did not believe the record supported a justification charge. Defense counsel protested that he had prepared his summation to rely on a justification defense and that the court had never previously indicated that it would not charge on the defense of justification. The trial judge summarized what she saw as the crucial question for the justification defense as follows:

> [I]nstead of going away from ... where he knows the danger is ... he walked towards Amsterdam Avenue.... [W]hen he gets to Amsterdam Avenue and 146th Street he sees the deceased a block away on 147th street ... [H]e did not walk back to where he knew was a

safe avenue.... [He] walked across the street to a building he couldn't get in because he knew the door would be locked and could only get in if someone answered the door and no one answered it.... [S]o my question is very simple.... If the defendant has a duty to retreat ... can he thereafter invoke self-defense by putting himself back in the same position with the gun at the ready? ... Instead of continuing to get away, he went back to where Bubblegum was minutes before.... [C]an ... the first clear opportunity to retreat with complete safety be ignored?

Essentially, the trial judge's view was that, once Davis had seen Bubblegum on Amsterdam Avenue, knowing of Bubblegum's past violence and his threat of future violence, he could not return with a gun to Amsterdam Avenue where Bubblegum was without violating the duty to retreat specified in N.Y. Penal Law § 35.15(2)(a) (McKinney 1998). Having failed to retreat when he had the opportunity, Davis was not entitled to raise the defense of justification.

The court refused to instruct the jury on justification and prohibited Davis's attorney from arguing justification in his summation. The judge did charge the jury on the partial defense of "extreme emotional disturbance," under N.Y. Penal Law §§ 125.20(2), 125.25(1)(a), which, if accepted by the jury, reduces murder to first-degree manslaughter. The jury accepted Davis's testimony with respect to his extreme emotional disturbance; it acquitted him of the murder charge, but convicted him of manslaughter in the first degree and criminal possession of a weapon in the second degree. He was sentenced to concurrent prison terms of seven to twenty-one years for manslaughter and five to fifteen years for gun possession.

## II. The Appeal

In the time between the trial and Davis's appeal to the Appellate Division, First Department, the New York Court of Appeals decided *In the Matter of Y.K.,* 87 N.Y.2d 430, 639 N.Y.S.2d 1001, 663 N.E.2d 313. The Court of Appeals made clear in that decision that, for a defendant claiming justification in the use of deadly physical force under N.Y. Penal Law § 35.15(1), the duty to retreat does not arise until the point at which the defendant reasonably believes that deadly physical force against him is "imminent." *Y.K.,* 87 N.Y.2d at 434, 639 N.Y.S.2d 1001, 663 N.E.2d 313. After *Y.K.,* the trial judge's reasoning—to the effect that Davis's duty to retreat barred him from returning to Amsterdam Avenue armed for his protection—could not stand. Accordingly, the Appellate Division, although it affirmed the conviction, did not adopt or even discuss the trial court's reasoning that Davis's return to Amsterdam Avenue with a gun precluded a defense of justification. *See People v. Davis,* 232 A.D.2d 209, 648 N.Y.S.2d 79 (1st Dep't 1996). Instead, the Appellate Division gave two new reasons why it considered the trial court's refusal to charge the jury on justification to be proper. The first was that Davis, having seen no gun on Bubblegum's person, had no reasonable basis for believing Bubblegum was about

to use deadly physical force against him. *See id.* at 80. The second was that Davis had offered no convincing reason for his failure to retreat from the scene "at the time of the actual shooting." *Id.*[3]

Following denial of leave to appeal to the Court of Appeals, *see People v. Davis,* 89 N.Y.2d 921, 654 N.Y.S.2d 723, 677 N.E.2d 295 (1996), Davis filed the present habeas corpus petition, raising the single claim that the trial court's refusal to instruct the jury on the defense of justification deprived him of his due process right to present his defense. The State opposed the petition both on procedural grounds and on the merits.

Magistrate Judge Andrew Peck found that the petition was not procedurally barred, but recommended that it be denied on the merits. *See Davis v. Strack,* No. 97 Civ. 5375(RMB)(AJP), 1999 WL 1565178 (S.D.N.Y. Apr. 13, 1999). Magistrate Judge Peck rejected the reasons given by the Appellate Division for affirming the conviction. He concluded the jury could have found that Davis reasonably believed Bubblegum was about to use deadly force, and that Davis had reasonably explained why he did not retreat at the time the shooting occurred. Magistrate Judge Peck agreed, however, with the trial judge's view that Davis's duty to retreat

---

**3.** The Appellate Division's analysis was as follows:

The trial court properly declined to charge the jury on the defense of justification since there was no objective view of the evidence that would support a finding that defendant's belief that the victim was using or about to use deadly physical force was reasonable (Penal Law § 35.15[2][a]; *Matter of Y.K.[,* 87 N.Y.2d 430, 639 N.Y.S.2d 1001, 663 N.E.2d 313 (1996) ] ) at the time defendant fatally shot the victim. Although defendant testified that the victim reached toward his waist immediately before the shooting, defendant acknowledged that he did not see any weapon on the victim's

person and that he did not give the victim a chance to turn around before repeatedly shooting him in the back. Defendant claimed that the victim kept looking at him right before the shooting and that defendant feared that the victim would again attack him as in the past. However, defendant did not explain why that final encounter posed a threat of deadly physical force when their previous exchanges of glances minutes earlier did not. Finally, we note that defendant offered no convincing reason as to why he did not retreat from the scene at the time of the actual shooting.

*Davis,* 648 N.Y.S.2d at 80.

arose when he first saw Bubblegum on Amsterdam Avenue, and that Davis therefore forfeited the defense of justification by returning to Amsterdam. *See id.* The district court (Berman, *J.*) adopted the magistrate judge's recommendations in all material respects. *See Davis v. Strack,* 1999 WL 1565178, No. 97 Civ. 5375(RMB)(AJP), slip op. (S.D.N.Y. Apr. 17, 2000). Finding the issue "deserving of appellate review," the court granted a certificate of appealability. *Davis v. Strack,* No. 97 Civ. 5375(RMB)(AJP), slip op. at 1 (S.D.N.Y. May 24, 2000).

On appeal Davis argues that the trial court's refusal to instruct the jury on the defense of justification deprived him of his due process right to a fair trial by preventing him from relying on a complete defense that was supported by credible evidence.

## DISCUSSION

### I. Was Davis's Constitutional Claim Fairly Presented to the State Courts?

The State first argues that Davis's federal due process claim was not fairly presented to the State courts, *see Picard v. Connor,* 404 U.S. 270, 275, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971), and that Davis's claim is therefore procedurally barred. While admitting that Davis cited the Fourteenth Amendment of the United States Constitution and mentioned "due process" in his state court brief to the Appellate Division, the State contends that these references were "pro forma" and ineffective because petitioner's argument was entirely devoted to state law.

■■■ Davis raised only one argument on his direct appeal to the Appellate Division. The point heading in his brief, printed in bold, read: "THE COURT'S REFUSAL TO CHARGE JUSTIFICATION ... DEPRIVED APPELLANT OF HIS DUE PROCESS RIGHT TO A FAIR TRIAL. U.S. CONST., AMEND. XIV; N.Y. CONST., ART. 1, § 6." We have held that if a petitioner cites to specific provisions of the U.S. Constitution in his state court brief, the petitioner has fairly presented his constitutional claim to the state court. *See Jones v. Vacco,* 126 F.3d 408, 413–14 (2d Cir.1997) (citing a specific constitutional provision alerts state courts to the nature of the claim); *Reid v. Senkowski,* 961 F.2d 374, 376 (2d Cir.1992) (even a minimal reference to the Fourteenth Amendment presents federal constitutional claim to state courts and satisfies exhaustion requirement). We therefore reject the State's argument that Davis's constitutional claim was not fairly presented.

■■■ Making the claim for first time, the State also argues that Davis's letters applying for leave to appeal to the Court of Appeals did not fairly present his federal claim. Davis submitted two letters—the first to Chief Judge Kaye and the second to Judge Ciparick. This Court has held that if a defendant, in an initial leave letter to the Chief Judge of the Court of Appeals, states that he "request[s] this court to consider and review all issues outlined in Defendant–Appellant's [Appellate Division] brief," such a request is "sufficiently specific" to present any federal constitutional claim set forth in the Appellate Division brief to the state Court of Appeals, regardless of whether the defendant reiterates the claim in any subsequent letter to the court. *See Morgan v. Bennett,* 204 F.3d 360, 369–72 (2d Cir.2000). Davis's letter to Chief Judge Kaye used language identical to that approved in *Morgan.* This fairly presented his constitutional claim to the Court of Appeals, notwithstanding that his subsequent letter to Judge Ciparick made no express mention

of the Constitution. The second letter was not a revocation of the first.

Since Davis has fairly presented his due process claim to the New York courts, we proceed to the merits.

## II. Federal Review of State Court Jury Instructions

■ We note at the outset that "it is not the province of a federal habeas court to reexamine state-court determinations of state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire,* 502 U.S. 62, 67–68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991). Where an error in a jury instruction is alleged, "it must be established not merely that the instruction is undesirable, erroneous, or even 'universally condemned,' but that it violated some right which was guaranteed to the defendant by the Fourteenth Amendment." *Cupp v. Naughten,* 414 U.S. 141, 146, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973). The question is not whether the trial court gave a faulty instruction, but rather "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." *Id.* at 147, 94 S.Ct. 396; *see also Estelle,* 502 U.S. at 72, 112 S.Ct. 475 (quoting and reaffirming *Cupp* ).

■ This Court has repeatedly held that "[i]n order to obtain a writ of habeas corpus in federal court on the ground of error in a state court's instructions to the jury on matters of state law, the petitioner must show not only that the instruction

misstated state law but also that the error violated a right guaranteed to him by federal law." *Casillas v. Scully,* 769 F.2d 60, 63 (2d Cir.1985); *see also Blazic v. Henderson,* 900 F.2d 534, 540 (2d Cir.1990) (quoting *Casillas,* 769 F.2d at 63) (same); *Sams v. Walker,* 18 F.3d 167, 171 (2d Cir.1994) (quoting *Casillas,* 769 F.2d at 63) (same). The fact that "federal habeas corpus relief does not lie for errors of state law," *Lewis v. Jeffers,* 497 U.S. 764, 780, 110 S.Ct. 3092, 111 L.Ed.2d 606 (1990), does not mean, however, that errors under state law cannot result in cognizable violations of a constitutional right to due process. What due process requires will often depend on what state law is. States are free to define the elements of, and defenses to, crimes. *See Apprendi v. New Jersey,* 530 U.S. 466, 484–87, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000); *McMillan v. Pennsylvania,* 477 U.S. 79, 84–86, 106 S.Ct. 2411, 91 L.Ed.2d 67 (1986). Once states have promulgated laws to define criminal conduct, however, federal due process protects a defendant from conviction unless he is shown in a fair proceeding to have violated those laws.

■ Thus, while we may not grant habeas relief for a "mere error of state law," *Blazic,* 900 F.2d at 541, a finding that the petitioner was erroneously deprived of a jury instruction to which he was entitled under state law is the first step in the determination whether that error violated the petitioner's federal due process rights. Accordingly, courts have granted habeas relief for a failure to charge justification where the evidence supported a justification charge under state law[4] and where

---

4. In determining whether a petitioner was entitled to a defense under state law, federal courts must of course defer to state-court interpretations of the state's laws, so long as those interpretations are themselves constitutional. *See Clemmons v. Delo,* 177 F.3d 680, 685 (8th Cir.1999) (distinguishing between

"case where the defense of self-defense was withheld completely from the jury" and one where the petitioner argued that "the contours of the defense, under [state] law, were not properly explained"); *Johnson v. Rosemeyer,* 117 F.3d 104, 108 (3d Cir.1997) (where petitioner complained that the justification

the erroneous failure to give such a charge was sufficiently harmful to make the conviction unfair. *Cupp*, 414 U.S. at 146, 94 S.Ct. 396. *See Means v. Solem*, 646 F.2d 322, 332 (8th Cir.1980) (granting habeas relief for error of state law on justification in jury instruction); *Barker v. Yukins*, 199 F.3d 867, 875–76 (6th Cir.1999) (same); *Zemina v. Solem*, 573 F.2d 1027, 1028 (8th Cir.1978) (adopting reasoning of *Zemina v. Solem*, 438 F.Supp. 455 (D.S.D.1977)) (same).

We cannot grant relief here without answering three questions in the petitioner's favor. First, was the justification charge required as a matter of New York state law? Second, if so, did the failure to give the requested charge violate the standard set out in *Cupp*. Third, if so, was the state court's failure of such a nature that it is remediable by habeas corpus, given the limitations prescribed by 28 U.S.C. § 2254?

### III. Was a Justification Charge Required under New York Law?

N.Y. Penal Law § 35.15 sets out the defense of justification for the use of force:

1. A person may, subject to the provisions of subdivision two, use physical force upon another person when and to the extent he reasonably believes such to be necessary to defend himself or a third person from what he reasonably believes to be the use or imminent use of unlawful physical force by such other person....

2. A person may not use deadly physical force upon another person under circumstances specified in subdivision one unless:

(a) He reasonably believes that such other person is using or about to use deadly physical force. Even in such case, however, the actor may not use deadly physical force if he knows that he can with complete safety as to himself and others avoid the necessity of so doing by retreating....

 Under New York law justification is a defense, not an affirmative defense; therefore, when the defense is raised on a proper evidentiary record, the People bear the burden of disproving it beyond a reasonable doubt. *See* N.Y. Penal Law §§ 25.00(1), 35.00 (McKinney 1998); *Y.K.*, 87 N.Y.2d at 433, 639 N.Y.S.2d 1001, 663 N.E.2d 313. "[W]henever justification is sufficiently interposed by the defendant, the People must prove its absence to the same degree as any element of the crime charged." *McManus*, 67 N.Y.2d at 546–47, 505 N.Y.S.2d 43, 496 N.E.2d 202. "[A] charge on justification is warranted whenever there is evidence to support it." *Id.* at 549, 505 N.Y.S.2d 43, 496 N.E.2d 202. "[I]f on any reasonable view of the evidence, the fact finder might have decided that the defendant's actions were justified .... the trial court should instruct the jury as to the defense and must when so requested." *People v. Padgett*, 60 N.Y.2d 142, 144–145, 468 N.Y.S.2d 854, 456 N.E.2d 795 (1983).

 Under New York law, in determining whether the evidence warrants a justification charge, the court must assess the record in the light most favorable to

---

charge given misinterpreted state law on justification, where state appellate court explicitly rejected the defendant's preferred reading of state justification statute, and where state court interpretation did not impermissibly shift state's constitutional burden of proof on elements of the offense, federal court would not "re-examine state court determinations of state law"). In other words, our role here is not to interpret New York's law of justification, but to determine whether the evidence was sufficient to warrant a justification charge under that law.

the defendant. *See Magliato,* 68 N.Y.2d at 29, 505 N.Y.S.2d 836, 496 N.E.2d 856; *McManus,* 67 N.Y.2d at 549, 505 N.Y.S.2d 43, 496 N.E.2d 202; *Padgett,* 60 N.Y.2d at 144–145, 468 N.Y.S.2d 854, 456 N.E.2d 795 (even where an aspect of defendant's testimony was inconsistent with justification defense, justification should have been charged); *People v. Watts,* 57 N.Y.2d 299, 301, 456 N.Y.S.2d 677, 442 N.E.2d 1188 (1982); *Torre,* 42 N.Y.2d at 1037, 399 N.Y.S.2d 203, 369 N.E.2d 759; *People v. Steele,* 26 N.Y.2d 526, 529, 311 N.Y.S.2d 889, 260 N.E.2d 527 (1970) (because jury may believe portions of both defense and prosecution evidence, justification should have been charged even when defendant claimed alibi); *People v. Huntley,* 87 A.D.2d 488, 452 N.Y.S.2d 952, 956 (Fourth Dep't 1982), *aff'd,* 59 N.Y.2d 868, 465 N.Y.S.2d 929, 452 N.E.2d 1257 (1983) (justification should have been charged where defendant testified, in conflict with other witnesses, that decedent had approached him with knife demanding money). In sum, if the record includes evidence which, viewed in the light most favorable to the defendant and drawing all reasonably permissible inferences in his favor, satisfies the essential elements of the defense of justification, the charge must be given.

 Where a justification charge is warranted, a court's refusal to instruct the jury that the People must disprove the defendant's claim of justification constitutes reversible error. *See, e.g., McManus,* 67 N.Y.2d at 549, 505 N.Y.S.2d 43, 496 N.E.2d 202 (new trial ordered where justification instruction did not charge that People must disprove justification); *cf. Padgett,* 60 N.Y.2d at 144–47, 468 N.Y.S.2d 854, 456 N.E.2d 795 (failure to charge justification warranted new trial); *Steele,* 26 N.Y.2d at 529, 311 N.Y.S.2d 889, 260

N.E.2d 527 (same); *People v. Scott,* 224 A.D.2d 926, 637 N.Y.S.2d 586 (4th Dep't 1996) (same); *Huntley,* 452 N.Y.S.2d at 956–57 (same); *People v. Almond,* 37 A.D.2d 571, 322 N.Y.S.2d 500, 502 (2d Dep't 1971) (People have to prove ability to retreat beyond a reasonable doubt; charge's failure to inform jury of this is reversible error, even absent objection); *cf. Torre,* 42 N.Y.2d at 1037, 399 N.Y.S.2d 203, 369 N.E.2d 759 (new trial warranted where justification charge erroneously failed to include charge on justification in defense of third persons); *People v.Rivera,* 138 A.D.2d 169, 530 N.Y.S.2d 802, 805–07 (1st Dep't 1988) (same).

 As we understand the statute and the leading New York cases construing it, *Y.K.,* 87 N.Y.2d 430, 639 N.Y.S.2d 1001, 663 N.E.2d 313; *People v. Goetz,* 68 N.Y.2d 96, 506 N.Y.S.2d 18, 497 N.E.2d 41 (1986); *McManus,* 67 N.Y.2d at 549, 505 N.Y.S.2d 43, 496 N.E.2d 202, for a person seeking to assert the defense of justification for his use of deadly force by reason of his belief that deadly force would be used against him, the essential elements of the defense (which the People must disprove) are as follows:

I. If the defendant reasonably believes

(a) that another person is using or is about to use deadly physical force against him,[5] and

(b) that it is necessary for him to use deadly physical force to defend himself, then the defendant is justified in using deadly physical force against the other person, but only to the extent he reasonably believes necessary to defend himself; provided the defendant did not have a duty to retreat instead of using deadly physical force in his defense.

---

**5.** If the defendant believed the threat of deadly physical force was directed against a third person, the elements would be adjusted accordingly.

II. The defendant has a duty to retreat if

(a) he knows he can retreat with complete safety as to himself and others, and

(b) he reasonably believes the other person's use of deadly physical force against him is either actually occurring or is imminent.

We proceed to examine these aspects of the defense of justification as they applied to Davis's trial.

### a. The trial court's ruling: Did Davis violate a duty to retreat at the time he returned to Amsterdam Avenue?

■ The trial judge believed Davis was not entitled to a charge on justification because, by returning to Amsterdam Avenue where he knew Bubblegum was, he violated the statutory duty to retreat. At that moment, Davis was able to retreat with complete safety, simply by leaving the vicinity. The trial judge believed Davis's duty to retreat arose as of that moment, so that his return to Amsterdam Avenue caused a forfeiture of his right to receive a charge on justification.

■ Under the terms of Section 35.15, the duty to retreat does not arise until the defendant forms a reasonable belief that the other person "is using or about to use deadly physical force." N.Y. Penal Law § 35.15(1). The ruling of the New York Court of Appeals in *Y.K.*, further spelled out that this duty does "not arise until the point at which [the other person's use of] deadly physical force was [actually occurring] or imminent." *Y.K.*, 87 N.Y.2d at 434, 639 N.Y.S.2d 1001, 663 N.E.2d 313.

In *Y.K.*, a girl and her companion were taunted by a gang of kids, who shouted at them and ran up behind Y.K., hitting her on the head. Y.K.'s companions fled to a nearby subway station for safety, but Y.K. simply kept walking and picked up a knife she found on the ground. The gang subsequently advanced again on Y.K. and pinned her to the ground; she fought back with the knife, stabbing one of her assailants. The Court of Appeals concluded that Y.K. had no duty to retreat at the time when her friend fled to the subway station, because at that time she was not yet imminently threatened with deadly physical force. By the time the use of deadly force against her was imminent, she was unable to retreat (because she was pinned to the ground) and was hence justified in using deadly force for her defense. *See Y.K.*, 87 N.Y.2d at 432–34, 639 N.Y.S.2d 1001, 663 N.E.2d 313.

This holding made abundantly clear that Davis's failure to retreat from the scene at the time he returned to Amsterdam Avenue did not violate the duty to retreat, causing forfeiture of his right to the charge on justification. When Davis first saw Bubblegum on Amsterdam Avenue, he did not reasonably believe Bubblegum was "about to use deadly physical force," N.Y. Penal Law § 35.15, or in the words of the Court of Appeals, that such use of deadly physical force against him was "imminent," *Y.K.*, 87 N.Y.2d at 434, 639 N.Y.S.2d 1001, 663 N.E.2d 313. Bubblegum had merely made eye contact with Davis; he had not moved in Davis's direction, much less made any threatening gestures. Thus, even though it would have been more prudent of Davis to leave the 146th Street and Amsterdam area when he saw Bubblegum there, his failure to do so was not a breach of a legal duty and did not cause the forfeiture of the defense of justification.

Davis's situation had much in common with that of Y.K. Y.K., like Davis could have retreated, as her friends did, when they were taunted by the accosting gang. Instead, she held her ground and picked up a knife for her protection. The Court

of Appeals clarified that her failure to retreat, which she could easily have done at the time, did not forfeit the defense of justification because at that time the use of deadly force against her was not yet imminent, although she was already menaced. Later, when she used deadly force in her defense, retreat was no longer possible. When Davis saw Bubblegum on Amsterdam Avenue, he had reason to be apprehensive that Bubblegum might use deadly force against him; but such force was not imminent. *See People v. Roldan*, 222 A.D.2d 132, 647 N.Y.S.2d 179, 183 (1st Dep't 1996) (defendant did not have reasonable fear of imminent deadly force based solely on previous violent encounters with decedent since a defendant "cannot be responding to the past use of deadly force, but only to its present or imminent use"). Davis was therefore not obligated to leave the scene on pain of forfeiting the defense of justification.

█ Thus, the justification defense remains available even if a prudent person in the defendant's position might have retreated earlier, or avoided the area where the potential assailant was to be found. *See Magliato*, 68 N.Y.2d at 30, 505 N.Y.S.2d 836, 496 N.E.2d 856 (justification charge warranted where decedent threatened defendant, defendant left and re-trieved gun, defendant went back to area, and defendant shot decedent after decedent came toward him with a club); *Mc-Manus*, 67 N.Y.2d at 549, 505 N.Y.S.2d 43, 496 N.E.2d 202 (justification charge warranted where, after several men drew guns on defendant and assaulted his companion, defendant left, retrieved gun, and after chasing assailants, killed one of the men after the men again assaulted his companion); *People v. Simmons*, 206 A.D.2d 550, 615 N.Y.S.2d 56, 58 (2d Dep't 1994) (reversing conviction where a jury instruction on justification did not make clear that the People's "burden of proving beyond a reasonable doubt that the defendant knew he could have retreated in complete safety ... related to that point in time when ... the defendant actually exerted deadly physical force against the decedent," rather than to fistfight which occurred immediately before); *cf. Rivera*, 530 N.Y.S.2d at 803–06 (charge of justification should have included not just self-defense but also justification in defense of third persons where decedent had previously terrorized family, family fled to another apartment building followed by decedent, defendant father saw his family into building, defendant then returned to street to confront decedent, and decedent, while reaching for his waistband, threatened to kill defendant and his family).[5]

---

5. The district judge and magistrate judge, in concluding that Davis's duty to retreat arose during the first encounter, relied heavily on cases in which New York appellate courts were reviewing convictions for the sufficiency of evidence after juries rejected proffered self-defense claims. These cases are inapposite not only because justification was charged, but because the New York courts were looking at the facts in the light most favorable to the People, whereas, in deciding whether the defendant was entitled to a charge, we must assess the facts in the light most favorable to the petitioner. *See, e.g., People v. Russell*, 91 N.Y.2d 280, 290, 670 N.Y.S.2d 166, 693 N.E.2d 193 (1998) (evidence that defendants did not avail themselves of opportunities for safe retreat was adequate to support jury's rejection of justification defense); *People v. Snell*, 256 A.D.2d 480, 682 N.Y.S.2d 80 (2d Dep't 1998) (same); *People v. Rattley*, 148 A.D.2d 642, 539 N.Y.S.2d 101, 102–03 (2d Dep't 1989) (same); *cf. People v. Seit*, 86 N.Y.2d 92, 96–99, 629 N.Y.S.2d 998, 653 N.E.2d 1168 (1995) (where court erred in excluding evidence relevant to reasonableness of belief that decedent had gun, error was harmless because jury would not have acquitted on self-defense grounds in any case since numerous witnesses testified to belief that decedent had gun; defendant first shot decedent in face and then, after decedent fell, walked over and shot him three times in the back

We do not dispute that Davis's return to the Amsterdam Avenue corner, armed with a gun was imprudent, and also illegal. Davis's return carrying a gun unquestionably violated New York's gun possession law and perhaps also constituted the offense, as the jury found, of illegal gun possession, second degree (possession of a firearm with intent to use illegally). But New York Law does not obligate a person to leave a place he is entitled to be merely because there is another person present who might represent a future threat. It is only when the threat becomes imminent that the actor is obligated to withdraw if he can do so in complete safety.[6]

We conclude that, under the law of New York, Davis did not lose his entitlement to the defense of justification by reason of his failure to withdraw from the Amsterdam Avenue neighborhood on seeing Bubblegum there.

### (b) The Appellate Division's Ruling.

Although the Appellate Division affirmed the trial court's denial of justification charge, it implicitly rejected the trial court's reasoning. As noted above, given the intervening decision of *Y.K.*, the Appellate Division gave no approval (nor even mention) to the trial judge's erroneous theory that Davis by returning to Amsterdam Avenue after fetching a gun forfeited the right to self defense under § 35.15. The Appellate Division instead approved the denial of a justification charge on two different theories. The first was that the evidence did not support a finding that the defendant reasonably believed Bubblegum was about to use deadly physical force against him. The second was that the defendant "offered no convincing reason why he did not retreat from the scene at the time of the actual shooting." *Davis*, 648 N.Y.S.2d at 80.

In making this ruling the Appellate Division relied on correct propositions of New York law. Davis was not justified in using deadly force in his defense unless he "reasonably believe[d] that [Bubblegum was] using or about to use deadly physical force [against him]." N.Y. Penal Law § 35.15(2)(a). And, as extensively discussed above, he was not permitted to use

from a distance of one or two feet; and defendant had the opportunity to retreat safely into his home when the decedent walked to his nearby van after initial confrontation).

6. The writer, speaking for himself alone, would add the following observation. The reasonableness of New York's imminence rule is illustrated by the circumstances Davis faced. The evidence showed that the 146th Street and Amsterdam neighborhood was the center of Davis's life. That was where he earned his living as a numbers runner. That, it appeared, was his social center. The evidence shows it was also the place where the vicious Bubblegum hung out. If the law required Davis to retreat whenever Bubblegum was present on the block—as opposed to only when he faced an imminent threat of violence—Davis would be forced to leave the social and business center of his life on pain of forfeiting the legal right to defend himself against a deadly attack by a repeat tormentor.

The law would essentially give over ascendancy to the bullies of the world.

For the situation Davis faced was not momentary. Had Davis left that evening on seeing Bubblegum, he would presumably have seen Bubblegum again on his return the next day, or the day after, and the same choice whether to leave on the chance that Bubblegum might attack him would present itself. The trial court's interpretation would ultimately mean that victims of threats of violence must either give up their habitat or lose their right to self defense. That is not the law of New York. Davis was not obligated to withdraw from the place where he made his life, on pain of losing his right of self defense, merely because a tormentor who had threatened to kill him was also to be found on the same streets. He was obligated to retreat (if that was safely possible) only when he faced imminent deadly force.

deadly force in his defense "if he [knew] that he [could] with complete safety as to himself and others avoid the necessity of so doing by retreating...." *Id.*

■ The problem we find with the Appellate Division's reasoning is that it is not compatible with the evidence, construed in the light *most favorable to Davis* as New York law requires. *See, e.g. McManus,* 67 N.Y.2d at 549, 505 N.Y.S.2d 43, 496 N.E.2d 202; *Magliato,* 68 N.Y.2d at 29, 505 N.Y.S.2d 836, 496 N.E.2d 856; *Torre,* 42 N.Y.2d at 1037, 399 N.Y.S.2d 203, 369 N.E.2d 759; *Watts,* 57 N.Y.2d at 301, 456 N.Y.S.2d 677, 442 N.E.2d 1188. Had Davis been convicted on correct instructions and challenged the sufficiency of the evidence, the evidence would be construed in the light most favorable to the People. *See, e.g. Rattley,* 539 N.Y.S.2d at 102 ("Viewing the evidence adduced at the trial in light most favorable to the prosecution .... [the jury could] discredit the defendant's justification defense."). Without question, the jury would have been entitled to disbelieve Davis's testimony about his own state of mind and to find that Davis did not believe Bubblegum was about to use deadly force against him. Perhaps (although this is less clear), the jury would also have been entitled to find that Davis could have retreated with safety at the time Bubblegum was turning back toward him (presumably by running north toward 147th Street).

But if the jury could reasonably have found facts that would sustain a defense of justification, Davis was entitled to rely on that defense under New York law. In our view, the evidence seen in the light most favorable to Davis is not compatible with either the proposition that Davis did not have a reasonable fear of deadly force or that he knew at the time of the shooting that he could retreat with complete safety.

***(i) Davis's reasonable belief that Bubblegum was about to use deadly force against him.***

■ Under New York law, a determination of the "reasonableness" of a defendant's fear must be based on the "'circumstances' facing a defendant or his 'situation.'" *Goetz,* 68 N.Y.2d at 114, 506 N.Y.S.2d 18, 497 N.E.2d 41. Such a determination properly includes "any relevant knowledge the defendant had about that person," including the perceived assailant's "physical attributes" and "any prior experiences [the defendant] had which could provide a reasonable basis for a belief that [the] person's intentions were to injure or rob him." *Id.* Viewed in the light most favorable to Davis, there was solid evidence that Davis's fear was reasonable.

The Appellate Division relied on the fact that Davis had not seen a gun on Bubblegum's person. *See Davis,* 648 N.Y.S.2d at 80. But Davis believed Bubblegum always carried a gun, and knew he had used it on Davis repeatedly.

Davis knew that Bubblegum, a six foot tall, 435-pound felon, had robbed, raped, and beaten other people at gun point. Bubblegum had robbed Davis at gun point three times, forced him to strip naked twice, raped him once, once urged his co-assailant to shoot Davis, and at their last meeting, after raping him, promised to kill Davis when he next saw him. This was that next meeting. When Davis crossed to the east side of Amsterdam to distance himself from Bubblegum, Bubblegum, who, according to eyewitness testimony, was visibly high on drugs, had followed and was advancing towards him. As he advanced, Bubblegum was keeping his eyes on Davis while conversing with the woman next to him, showing that he was preoccupied with Davis. A possible accomplice of Bubblegum's had moved to a

position directly across the street. After passing a few feet beyond Davis, Bubblegum said to the woman with him, "I have to take care of something . . . I have to hit this guy off." While Davis did not hear these words, he saw Bubblegum stop and turn back in Davis's direction, reaching toward his waistband. On all this evidence, we think it was undisputably reasonable for Davis to believe that within a second, Bubblegum's gun would once again be pointing at him, and he would be dead.

### (ii) At the moment of the shooting, Davis did not know he could retreat with complete safety.

In one sentence at the end of its discussion, the Appellate Division asserted as a second reason justifying the trial court's refusal to charge on self defense that Davis "offered no convincing reason why he did not retreat from the scene at the time of the actual shooting." *Davis,* 648 N.Y.S.2d at 80. We find the observation quite puzzling.

The "time of the actual shooting" was the moment when Bubblegum, having followed Davis across Amsterdam Avenue and having advanced toward him, staring at him, suddenly turned in Davis's direction, and reached toward his waistband for what Davis reasonably believed to be a gun. If Davis's reasonable belief that Bubblegum had a gun had been correct, he had one or two seconds left to live. *See People v. Desmond,* 93 A.D.2d 822, 460 N.Y.S.2d 619, 620 (2d Dep't 1983) (question is not whether the defendant was "in actual peril of his life," but whether "he reasonably believed he was in such peril"). Undoubtedly, he could have run northward up Amsterdam, in the direction of 147th Street. But the statute imposes the duty to retreat only when the actor "knows he can [do so] with complete safety." N.Y. Penal Law § 35.15(2)(a). In view of how close Bubblegum was to him, Davis could not have fled without offering his back as an easy target. He could retreat, but not with "complete safety," as New York's justification statute requires. In response to questions why he did not run away eastward on 146th Street as Bubblegum approached him from the 147th Street side, Davis explained that, believing that Bubblegum was armed and intended to kill him, he was terrified to turn his back on Bubblegum. We therefore find no basis for the Appellate Division's observation that Davis "offered no convincing reason as to why he did not retreat from the scene at the time of the actual shooting," *Davis,* 648 N.Y.S.2d at 80, particularly given that it was the People's burden to prove beyond a reasonable doubt that defendant knew that he could have retreated with complete safety. *Almond,* 322 N.Y.S.2d at 502.

\* \* \*

We believe the evidence, when viewed in the light most favorable to Davis, easily satisfied all the elements of the justification defense under § 35.15. On that evidence, a jury could have found Davis reasonably believed that Bubblegum was "about to use deadly physical force" against him, and that it was necessary for Davis to use deadly force against Bubblegum to defend himself. The jury could have found that, when Davis had the opportunity to retreat from the scene in safety, he was not yet threatened with imminent use of deadly force. But when the time came that he reasonably believed Bubblegum was about to shoot him, it was no longer possible for him to retreat in safety.

We conclude that under New York Law Davis was entitled to rely on the defense

of justification under § 35.15 and to have the jury instructed on that issue.[7]

## IV. Did the denial of an instruction required by New York State Law result in a denial of Due Process?

■ Having concluded that the failure to charge justification was an error of state law, we must next consider whether the error "so infected the entire trial that the resulting conviction violates due process." *Cupp,* 414 U.S. at 147, 94 S.Ct. 396.

■ Under the circumstances of this case, the trial court's ruling completely deprived Davis of his highly credible defense to the homicide charge and guaranteed his conviction. In his testimony, Davis had confessed to intentionally shooting Bubblegum. Without an instruction on the justification defense, the question whether he was guilty of the homicide was thus open and shut. On the other hand, if the trial court had not ruled justification out of the case, Davis had a compelling defense for the jury to consider—on which the People had bore the burden of proof.[8]

The evidence on the issue was quite favorable to Davis. And the jury, by ruling in Davis's favor on the question of extreme emotional disturbance, showed that it generally accepted the truthfulness of Davis's testimony.[9] Taking all this into account, there is a substantial likelihood that a properly instructed jury would have found in Davis's favor on the homicide charge.

This case is markedly different from *Blazic,* 900 F.2d at 541–43. In *Blazic* we denied habeas relief where the petitioner was erroneously deprived of a justification charge. We did so because we found the denial would not have influenced the jury's verdict. Blazic's principal claim (to which he testified) was that the gun had gone off accidentally—a claim inconsistent with his subordinate claim of justified intentional use of deadly force. Because the jury was instructed extensively on intent in connection with Blazic's principal defense, and because the erroneous failure to instruct related only to Blazic's secondary defense (which was incompatible with his own testimony), we concluded that the failure to instruct did not affect the jury's delibera-

7. Judge Sotomayor would add the following comments. In support of its contention that there is no objective view of the evidence under which the defendant could have had a reasonable belief that there was an imminent danger, the Appellate Division says: "[D]efendant did not explain why that final encounter posed a threat of deadly physical force when their previous exchanges of glances minutes earlier did not." 648 N.Y.S.2d at 80. Conceivably, the state court could have credited the defendant's contention that he did not reasonably believe that there was an imminent threat of deadly danger during the initial brush with Bubblegum. The Appellate Division, apparently concluding that the two encounters were in all relevant respects equivalent, therefore held that even under defendant's view of the case, a justification defense was not supported by the evidence. Yet even if this is the appropriate interpretation of the Appellate Division's decision, that court still unreasonably applied

New York law. As discussed *supra* at III(a), the passive eye contact between Bubblegum and Davis, absent the more threatening physical gestures that accompanied the moments before the shooting, could not lead a reasonable person to believe that a threat of fatal harm was imminent.

8. Under New York law, the justified use of force does not constitute a crime. *See McManus,* 67 N.Y.2d at 545, 505 N.Y.S.2d 43, 496 N.E.2d 202 ("Justification does not make a criminal use of force lawful; if the use of force is justified, it cannot be criminal at all.").

9. *See Henderson v. Kibbe,* 431 U.S. 145, 156, 97 S.Ct. 1730, 52 L.Ed.2d 203 (1977) ("[It is] logical to assume that the jurors would have responded to an instruction [that was not given] consistently with their determination of the issues that were comprehensively explained.").

tions and that the error therefore did not infect the trial in the manner contemplated by *Cupp* as required for relief on habeas review. *See id.*

Here, in contrast, the error was of immense importance. This is not a case of a minor error of state law in explaining the legal standards to the jury. It is not a case of a refusal to instruct on a fantastic, improbable defense that the jury was unlikely to adopt. Nor was the absence of an instruction on justification mitigated by other portions of the charge. *See, e.g., Kibbe,* 431 U.S. at 156–57, 97 S.Ct. 1730 (omission of instruction on causation did not infect trial so as to violate due process because jury, in determining that defendant had acted recklessly, necessarily found that the ultimate harm was foreseeable); *Blazic,* 900 F.2d at 542–43 (although defendant was entitled to justification charge as a matter of New York law, in light of instruction on accidental and intentional killing, failure to charge justification did not deprive petitioner of due process because there was no basis to conclude that jury would have responded differently if charge was given); *Pedroza,* 750 F.2d at 205 (new trial warranted where court's instructions, which were general in form, were inadequate to inform jury of defense theory).

The effects of the court's error were to deprive Davis entirely of his defense—on which he had a significant possibility of prevailing—and to insure his conviction. The effect of the error was catastrophic.

In similar circumstances, the Eighth Circuit in *Means* granted habeas relief where the trial court's erroneous refusal to give an instruction on self-defense infected the trial so as to be of "constitutional magnitude." 646 F.2d at 331–32. The court concluded that the error had so infected the trial as to violate due process. *See id.* at 332; *see also Zemina,* 573 F.2d

at 1028, adopting reasoning of *Zemina,* 438 F.Supp. at 465–70 (granting writ where state courts erred in determining that there was inadequate evidence to support instructions on justification and ailing instruction violated due process under *Cupp* ); *Duckett v. Godinez,* 67 F.3d 734 (9th Cir.1995) (where, in light of the instructions as a whole and the given evidence in the case, the failure of state trial court to give requested instruction rendered trial fundamentally unfair, the trial court's refusal to give the instruction violated the petitioner's federal due process rights under *Cupp* ); *cf. Barker,* 199 F.3d at 875 (where Michigan Supreme Court held that trial court erred by refusing to instruct that deadly force would have been justified to stop imminent rape, but concluded that error was harmless because no reasonable juror could have believed force used was necessary to prevent rape by elderly man, Michigan Supreme Court improperly invaded province of jury, and the error so infected the trial as to violate due process under *Cupp* ).

We are confident that this error had such enormous practical importance for Davis's conviction on the homicide charge that it must be considered a violation of due process. The error seriously infected "the entire trial," so that its result cannot be considered fair. The *Cupp* standard was satisfied.

## V. Application of 28 U.S.C. § 2254(d)

Under 28 U.S.C. § 2254(d), a writ of habeas corpus on behalf of a state prisoner may not be granted unless "the adjudication of the claim (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in

the light of the evidence presented in the State court proceeding."

Subsection (1) requires as a predicate to a writ of habeas corpus a state court decision that "was either 'contrary to … clearly established Federal law, as determined by the Supreme Court of the United States,' or 'involved an unreasonable application of clearly established federal law as determined by the Supreme Court of the United States.' " *Williams v. Taylor*, 529 U.S. 362, 404–05, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (emphasis omitted). Justice O'Connor explained for the Court in *Williams* that the "contrary to" branch applies only if the "state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law … [or if] the state court confronts facts that are undeniably indistinguishable from a relevant Supreme Court precedent and arrive at a result opposite to [the Supreme Court's result]." *Id.* at 405, 120 S.Ct. 1495. In this case, a writ cannot be justified under the "contrary to" clause of § 2254(d)(1) because there is no indication that the Appellate Division construed the due process clause in a manner "opposite to" the Supreme Court's rulings.

On the other hand, *Williams* explained, "A state-court decision that correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular person's case certainly would qualify as a decision 'involving an unreasonable application of … clearly established Federal law.' " *Id.* at 407–08, 120 S.Ct. 1495. (internal punctuation omitted). The "unreasonable application" clause squarely covers these facts. The Appellate Division unreasonably rejected Davis's due process challenge. On the basis of the evidence presented, Davis had a clear right under New York law to have the jury consider his defense, and the trial in which he was denied that right was egregiously at odds

with the standards of due process propounded by the Supreme Court in *Cupp*.

▮ We think the case also fits comfortably under subsection (2) of § 2254(d) in that it resulted in a "decision that was based on an unreasonable determination of the facts in the light of the evidence." 28 U.S.C. § 2254(d)(2). *See also Holden v. Miller*, 2000 WL 1121551, at *17 (S.D.N.Y. Aug.8, 2000) (applying 28 U.S.C. § 2254(d)(2) to state trial court's decision not to give justification charge). The Appellate Division rejected Davis' due process challenge on the basis of its findings that (1) Davis had no reasonable belief that Bubblegum was about to use deadly force because he did not see a weapon on Bubblegum's person and did not give Bubblegum a chance to turn before shooting and (2) Davis offered no convincing reason as to why he did not retreat at the time of the shooting. For reasons explained above, those conclusions are without reasonable basis. We conclude that the writ must be granted on either the unreasonable application prong of § 2254(d)(1) or on the basis of unreasonable determinations of fact under § 2254(d)(2).

## VI. The Charge of Criminal Possession of a Loaded Firearm with Intent to Use Unlawfully

Davis was convicted not only of first-degree manslaughter, but also of criminal possession of a weapon, second degree, in violation of N.Y. Penal Law § 265.03(2). On this charge, he received a sentence of five to fifteen years imprisonment. The statute provides: "A person is guilty of criminal possession of a weapon in the second degree when, *with intent to use the same unlawfully* against another … [h]e possesses a loaded firearm." *Id.* (emphasis added.) Davis contends his conviction on this charge was also obtained in violation of due process. But his claim with

respect to the conviction for criminal possession of a weapon is quite different from his claim relating to the manslaughter conviction.

 Under New York Law, justification under § 35.15 is not a defense to second degree criminal possession of a weapon. *See People v. Pons,* 68 N.Y.2d 264, 265, 508 N.Y.S.2d 403, 501 N.E.2d 11 (1986); *People v. Almodovar,* 62 N.Y.2d 126, 476 N.Y.S.2d 95, 464 N.E.2d 463 (1984). While a weapons-possession crime may be made more serious by the defendant's intent, it is the act of possessing a weapon unlawfully which is the essence of the possession offenses defined in N.Y. Penal Law §§ 265.01–265.05. *See Almodovar,* 62 N.Y.2d at 130, 476 N.Y.S.2d 95, 464 N.E.2d 463. Thus, "a person either possesses a weapon lawfully or he does not and he may not avoid the criminal charge by claiming that he possessed the weapon for his protection." *Id.* A defendant may use his illegally possessed gun only in a manner that falls within the protection of the justification statute and nonetheless be guilty of criminal possession, second degree. That is because, regardless that his actual, ultimate use of the gun might not have been unlawful (because it was justified under § 35.15), he may have harbored intentions to use the gun in other circumstances that would have been unlawful. *See Pons,* 68 N.Y.2d at 267–68, 508 N.Y.S.2d 403, 501 N.E.2d 11 ("[I]t does not follow that because defendant was justified in the actual shooting of the weapon under the particular circumstances existing at that moment, he lacked the intent to use the weapon unlawfully during the continuum of time that he possessed it prior to the shooting."); *People v. Lide,* 210 A.D.2d 507, 620 N.Y.S.2d 462, 463 (2d Dep't 1994) (upholding second-degree possession con-

viction despite acquittal on murder charge because jury could have concluded defendant intended to use weapon unlawfully during time he possessed it prior to shooting). Thus, the trial court's denial of a charge on justification did not deny Davis the opportunity to have the jury consider a defense to the charge of criminal possession.

 The denial of the charge on justification nonetheless prejudiced Davis's defense in a somewhat different way. If the jury found that Davis had intended to use the gun only in circumstances falling within the protection of the justification statute (i.e., only in necessary self defense and only in circumstances where he could not safely retreat), then the jury might have determined that the People had failed to prove the essential element of intent to use the gun unlawfully. The jury might thus have found Davis guilty of the lesser included offense of criminal possession, third degree (for possession of a loaded firearm) [10], but not of criminal possession, second degree, requiring intent to use unlawfully. Without an explanation from the court in the course of its instructions on how use of a gun against another might be justified (and thus not "unlawful"), the jury lacked information that would have explained how an intention to use the gun against Bubblegum in certain circumstances might not be an "intent to use the same unlawfully against another." N.Y. Penal Law § 265.03(2).

We conclude, nonetheless, that Davis does not state a valid claim under 28 U.S.C. § 2254. Given the fact that justification under § 35.15 is not a defense to criminal weapon possession, second degree, the denial of the instruction did not, with respect to the possession charge, vio-

10. N.Y. Penal Law § 265.02(4) provides: "A person is guilty of criminal possession of a weapon in the third degree when ... [h]e possesses any loaded firearm."

late "clearly established Federal law, as determined by the Supreme Court." 28 U.S.C. § 2254(d)(1). Nor was it "based on an unreasonable determination of the facts." 28 U.S.C. § 2254(d)(2). *See also Cupp*, 414 U.S. at 147, 94 S.Ct. 396. Therefore Davis's petition relating to his conviction for illegal gun possession, second degree, must be denied.

### Conclusion

With respect to Davis's conviction for manslaughter, we reverse the judgment of the district court and remand with instructions to grant the writ, directing that the conviction be vacated. The State of New York is, of course, free to retry Davis for manslaughter if it chooses. With respect to Davis's conviction for criminal possession of a weapon, second degree, the judgment of the district court dismissing the petition is affirmed.