**Reginald JACKSON, Petitioner–Appellee,**

v.

**Ernest EDWARDS, Superintendent of Otisville Correctional Facility, Respondent–Appellant.**

**Docket No. 03–2805.**

United States Court of Appeals, Second Circuit.

Argued: Oct. 22, 2004.

Decided: April 14, 2005.

Esther Noe, Assistant District Attorney (Charles J. Hynes, District Attorney, on the brief, Leonard Joblove, Assistant District Attorney, of counsel), Kings County, Brooklyn, NY, for Respondent–Appellant.

Vida M. Alvy, Alvy & Jacobson, New York, NY, for Petitioner–Appellee.

Before: NEWMAN, SACK, B.D. PARKER, Circuit Judges.

B.D. PARKER, JR., Circuit Judge.

Ernest Edwards, the Superintendent of the Otisville Correctional Facility, appeals from a judgment of the United States District Court for the Eastern District of New York (Weinstein, *J.*) granting Reginald Lee Jackson's petition for a writ of habeas corpus. *See* 28 U.S.C. § 2254(d). We have jurisdiction under 28 U.S.C. § 2253(a).

Jackson was convicted in New York Supreme Court, Kings County, of second degree manslaughter and second degree criminal possession of a weapon in connection with the 1997 shooting death of Selwyn Anthony Brown. The District Court granted habeas relief on both offenses based on two separate claims: (1) Jackson was deprived of due process under the Fourteenth Amendment by the trial court's refusal to allow the jury to consider a justification defense; and (2) he was denied effective assistance of counsel under the Sixth Amendment when trial counsel cited inapposite case law to the court. We hold that the District Court correctly granted Jackson habeas relief on his due process claim. Consequently, we need not reach his Sixth Amendment claim.

## BACKGROUND

### I. Events of March 7–8, 1997

Jackson was the superintendent of an apartment building at 110 Grove Street in Brooklyn, New York. His responsibilities included, among others, building security. Late in the evening of March 7, 1997, a group of family members and friends was drinking and playing cards in apartment 1B. The apartment belonged to Bernadette Brown, who was joined that evening by her sister-in-law, Mirna Brown, as well as by Ula Dawn Hall and her younger sister Natalie Hall. Later, Selwyn Anthony Brown ("Brown"), who was Bernadette's brother and Mirna's husband, arrived with his nephew George Adams. Brown had been drinking heavily by the time he joined the party.

Ula and Natalie Hall had previously lived upstairs in apartment 2E but had moved out a year earlier. Their mother had lived in the apartment until around January of that year and had surrendered her key before moving out. Although the Halls no longer rented apartment 2E, Natalie Hall had retained a key, and a lock the Halls had installed remained on the door.

Jackson told police that close to midnight, he learned from the daughter of another tenant, Patricia Drummond, that Natalie Hall and her friends were inside apartment 2E, which supposedly had been vacant for two months. Drummond was a friend of Jackson's who lived in the building, and, after the Halls had moved out, he had permitted her to store food in the refrigerator of 2E. Hoping to secure the apartment, Jackson went to 110 Grove Street to change the lock.

Once at the building, Jackson encountered Natalie Hall and asked her for the keys to 2E, which she gave him. When Ula learned that her sister had given up the keys, she insisted that they find Jackson. The sisters eventually located him upstairs, sitting in the doorway of 2E and changing the lock. Ula Hall rushed past Jackson into the apartment and went to the refrigerator. An argument ensued as Ula claimed that food in the refrigerator belonged to her family, while Jackson ex-

plained that the food belonged to Patricia Drummond. Ula also demanded to know why Jackson had taken the keys from her sister. Jackson responded that she no longer had a right to be in the apartment, which had been rented to another tenant. The argument continued until Patricia Drummond arrived at the apartment and claimed the food as her own. Ula then left the apartment and walked toward the stairs.

Hearing noise above them, Brown and his nephew, George Adams, left apartment 1B and met Ula in the stairwell. Brown asked her what had happened and Ula told him to "leave it alone" and "forget it." When Ula finally told him that she had wanted to get the keys to 2E from Jackson, Brown walked past her and insisted, "no, get your keys now." By this time—now the early morning hours of March 8—Brown, Ula Hall, Natalie Hall, Bernadette Brown, Mirna Brown, and George Adams had all congregated around the doorway of apartment 2E, along with Patricia Drummond and Jackson.

A heavily intoxicated Brown approached Jackson, and a loud, hostile argument ensued.[1] Although both Bernadette and Mirna implored Brown to stop the confrontation, the argument grew increasingly heated and others became involved. There is some dispute over precisely what happened next. Ula Hall, Mirna Brown, and Bernadette Brown all claimed that they saw no physical contact between Brown and Jackson. Immediately after the incident, George Adams told police that he saw his uncle in a "fist fight" with Jackson; however, he later testified that he had only seen "pushing and shoving." Natalie Hall testified that she saw Brown raise his hands and push Jackson. Patri-

cia Drummond testified that she saw Brown punch Jackson twice, knocking him to the ground. At some point, Jackson pulled a gun out of his pocket. The gun discharged, and Brown was shot in the chest. Jackson ran out of the building and discarded the gun, which was never recovered. Brown later died from the gunshot wound.

Several hours after the shooting, Jackson called a police officer with whom he was acquainted and surrendered. At the police station, Jackson waived his *Miranda* rights, confessed to the shooting, and gave the arresting officers a written statement. Jackson described being contacted by Drummond's daughter, going to 110 Grove Street to secure apartment 2E, and having an argument with Ula Hall over the keys and the food in the refrigerator. He stated that "a tall male" then came up to him and told him to "[g]ive her the fucking keys." Jackson explained that at that point, Patricia Drummond stepped between the two men, but Brown managed to punch Jackson twice in the face knocking him down. Jackson stated that he saw a crowd coming towards him and then remembered "the crowd opening up and clearing a path."

Jackson again confessed to these events on videotape. He stated that he had recently purchased a .38 revolver, which he used for protection while working as a superintendent late at night. He explained that he believed he needed the gun because there was significant drug activity in both 110 Grove Street and his own, neighboring apartment building, and because there was considerable drinking and misbehavior in the buildings involving both tenants and outside visitors. Jackson stat-

---

1. The medical examiner later determined that Brown's blood-alcohol content was 0.21%, and that the percentage of alcohol in his urine was 0.29% at the time he was killed. A blood alcohol level of 0.20% and a urine alcohol level of more than 0.27% constitute "acute intoxication." *People v. Emmick*, 136 A.D.2d 892, 893, 525 N.Y.S.2d 77 (4th Dep't 1988).

ed that he kept the gun in the basement of his apartment building, where he was also the superintendent, and that he only carried it with him when he was cleaning or securing the buildings late at night. He stated that he never took the gun "off the premises" after purchasing it.

Jackson further stated that he understood that Brown's "job" that evening was "to take the keys and start beating me up." He described Brown punching him twice in the face and stated that he "fell back" or "stepped back a couple of steps," looked up, and saw "the whole crowd ... coming." He then pulled the gun out of his pocket, but he did not remember pointing it at Brown when it went off.

## II. The Jury Charge and Verdict

Because Jackson had been charged with, *inter alia,* second degree murder, at the conclusion of the evidence, defense counsel requested a justification instruction under New York Penal Law § 35.15. He asked the court to instruct the jury that Jackson was justified in using deadly physical force because he reasonably believed such force was necessary to protect himself from an imminent assault or robbery by Brown or to defend against a burglary of the apartment. The court denied the request on the grounds that neither the trial evidence nor the case law defense counsel cited supported such an instruction. The court found that having "reviewed the statute," "the only possible exception might be if there was a burglary being committed or an arson," but "none of that is applicable in this case."

Barred from arguing justification, defense counsel argued in his summation that Jackson shot Brown when the gun went off accidentally after Jackson had removed it from his pocket. The trial court then charged the jury on Murder in the Second Degree, N.Y. Penal Law § 125.25(2), or the lesser-included offense

of Manslaughter in the Second Degree, N.Y. Penal Law § 125.15, and Criminal Possession of a Weapon in the Second Degree, N.Y. Penal Law § 265.03 (McKinney 1997), or in the alternative, Criminal Possession of a Weapon in the Fourth Degree, N.Y. Penal Law § 265.01 (McKinney 1997). The jury acquitted Jackson of second degree murder but convicted him of second degree manslaughter and second degree criminal possession of a weapon. In September 1997, the court sentenced Jackson to concurrent indeterminate terms of five to fifteen years for manslaughter, and seven and one-half to fifteen years for weapons possession.

## III. The State Appeal

Jackson appealed to the Appellate Division where he contended that (1) the trial court improperly denied his request for a jury instruction on justification; and (2) he was denied effective assistance of counsel. The Appellate Division unanimously affirmed his conviction, tersely concluding:

> Contrary to the defendant's contention, no reasonable view of the evidence supports a justification charge and, thus, the trial court properly declined to give it (*see,* Penal Law § 35.15[2] ).

> Under the circumstances of this case, the defendant was not denied the effective assistance of counsel (*see, People v. Baldi,* 54 N.Y.2d 137, 444 N.Y.S.2d 893, 429 N.E.2d 400).

*People v. Jackson,* 266 A.D.2d 475, 476, 698 N.Y.S.2d 887, 887 (2d Dep't 1999). Jackson's application for leave to appeal to the New York Court of Appeals was denied. *People v. Jackson,* 94 N.Y.2d 921, 708 N.Y.S.2d 360, 729 N.E.2d 1159 (2000).

## IV. The Habeas Corpus Petition

On January 26, 2001, Jackson petitioned the District Court for a writ of habeas corpus, raising the two claims he had

raised to the Appellate Division on direct appeal—that the trial court improperly denied his request for a justification instruction and that he was denied the effective assistance of counsel.

The District Court granted Jackson's petition on both grounds: "the denial of due process resulting from the trial court's failure to instruct the jury on justification and the ineffectiveness of trial counsel in relying on inapposite case law to support his request for a justification charge." *Jackson v. Edwards,* 296 F.Supp.2d 292, 308 (E.D.N.Y.2003). The District Court reasoned that Jackson was entitled to have the jury instructed on a justification defense with regard to the homicide charge because "[f]rom the testimony and evidence presented at petitioner's trial, a jury could have concluded that petitioner reasonably believed that Brown was attempting to take the keys by force from him— that is, attempting to commit a robbery," or that Brown was trying "to enter apartment 2E with the intent to take the keys from petitioner—attempting to commit a burglary." *Id.* at 301 (citing N.Y. Penal Law §§ 35.15(2)(b); 35.15(2)(c); 35.20(3)). Furthermore, the District Court concluded that the trial court's error in failing to charge justification when it was warranted under New York law "so infected the proceedings as to deprive petitioner of his federal due process right to a fair trial." *Id.* at 302 (citing *Davis v. Strack,* 270 F.3d 111 (2d Cir.2001)). In addition to vacating Jackson's homicide conviction, the District Court also set aside his conviction for second degree weapons possession, finding that "a properly instructed jury might conclude that petitioner was justified in using deadly force to thwart a burglary, that the shooting was 'entirely lawful,' and that he therefore did not have the intent to use the weapon unlawfully against another at the moment of the shooting." *Id.* at 305. The Court ordered Jackson released within sixty days unless the State appealed or re-

tried him. *Id.* at 308–09. This appeal ensued.

## DISCUSSION

■ We review *de novo* a district court's decision to grant or deny habeas corpus relief, *Harris v. Kuhlmann,* 346 F.3d 330, 342 (2d Cir.2003), and review findings of fact for clear error. *Jenkins v. Artuz,* 294 F.3d 284, 290 (2d Cir.2002).

### I. Exhaustion

■ To be eligible for habeas relief, the "substance" of Jackson's Fourteenth Amendment due process claim must have been exhausted, that is, it must have been "fairly presented" to the appropriate state appellate court. *Picard v. Connor,* 404 U.S. 270, 275, 278, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971); 28 U.S.C. § 2254(b)(1). Normally, for exhaustion to occur, a petitioner must satisfy one of the four prongs of *Daye v. Attorney General,* 696 F.2d 186, 194 (2d Cir.1982) (en banc). Under *Daye,* a petitioner who does not cite "chapter and verse of the Constitution" may nonetheless "fairly present to the state courts the constitutional nature of his claim" through:

(a) reliance on pertinent federal cases employing constitutional analysis, (b) reliance on state cases employing constitutional analysis in like fact situations, (c) assertion of the claim in terms so particular as to call to mind a specific right protected by the Constitution, and (d) allegation of a pattern of facts that is well within the mainstream of constitutional litigation.

*Id.* The State contends that Jackson failed to exhaust his claim because his brief to the Appellate Division argued only that the trial court's refusal to instruct the jury on the defense of justification violated New York law and failed to cite the federal Constitution, federal case law, or state cases employing federal constitutional

analysis. The District Court concluded that Jackson nevertheless alleged a "pattern of facts ... well within the mainstream of constitutional litigation," *id.*, because "[o]n the facts and circumstances as presented to the state court, 'no reasonable jurist could doubt that the defendant's claim implicated [a] constitutional right.'" *Jackson*, 296 F.Supp.2d at 300 (citing *Holland v. Scully*, 797 F.2d 57, 64–65 (2d Cir.1986)). The State responds that Jackson could not have satisfied the fourth prong of *Daye* because "[a] jury charge in a state trial is normally a matter of state law." *United States ex rel. Smith v. Montanye*, 505 F.2d 1355, 1359 (2d Cir.1974).

 We believe Jackson exhausted his claim. Exhaustion does not require citation of "book and verse of the federal constitution." *Picard*, 404 U.S. at 278, 92 S.Ct. 509. The purpose of the exhaustion requirement is to ensure that a state court is given the "opportunity to pass upon and correct alleged violations of its prisoners' federal rights." *Id.* at 275, 92 S.Ct. 509 (internal quotation marks and citation omitted). This opportunity is most straightforwardly presented when the relevant constitutional principle is explicitly raised in state proceedings. However, this opportunity is also presented when the substance of the federal habeas corpus claim is clearly raised and ruled on in state court, *Picard*, 404 U.S. at 278, 92 S.Ct. 509, although the federal principle may initially be attached to a different label than the one ultimately affixed in federal habeas proceedings. *See, e.g., Nichols v. Sullivan*, 867 F.2d 1250, 1253 (10th Cir. 1989) ("we do not believe this label change ... creates a fundamentally new argument which the state courts did not have an opportunity to consider."); *Koontz v. Glossa*, 731 F.2d 365, 369 (6th Cir.1984); *Williams v. Holbrook*, 691 F.2d 3, 9–11 (1st Cir.1982).

In developing and refining the "fairly present" standard, the Supreme Court has concentrated on the degree of similarity between the claims that a petitioner presented to the state and federal courts. For example, *Anderson v. Harless*, 459 U.S. 4, 7, 103 S.Ct. 276, 74 L.Ed.2d 3 (1982), held that a habeas petitioner had not fairly presented a federal due process claim in state court when he argued that the trial court's jury instruction was "erroneous," and cited only a state law case holding, under Michigan law, that malice should not be implied from the fact that a weapon is used. The Court rejected petitioner's contention that the "due process ramifications" of his argument to the Michigan court "were self-evident," noting that the state court had interpreted the claim under principles that were entirely different from petitioner's federal due process theory. *Id.* As the Court explained, "[i]t is not enough that ... a somewhat similar state-law claim was made." *Id.* at 6, 103 S.Ct. 276.

*Duncan v. Henry*, 513 U.S. 364, 115 S.Ct. 887, 130 L.Ed.2d 865 (1995) (per curiam), similarly held that a habeas petitioner had not exhausted his federal due process claim when he argued before the state appellate court that the trial court's failure to sustain an evidentiary objection was a "miscarriage of justice." *Id.* at 364, 115 S.Ct. 887. Rather than considering whether the evidence was so inflammatory as to prevent a fair trial, the state court merely asked whether its prejudicial effect outweighed its probative value—a state law question. Because the state and federal inquiries were "no more than somewhat similar" rather than "virtually identical," the claim had not been fairly presented. *Id.* at 366, 115 S.Ct. 887 (internal quotation marks and citation omitted).

Most recently, in *Baldwin v. Reese*, 541 U.S. 27, 124 S.Ct. 1347, 158 L.Ed.2d 64 (2004), the Court held that a prisoner who did not "explicitly say that the words 'ineffective assistance of *appellate* counsel' refer to a federal claim," but did explicitly say that he was raising a federal claim of ineffective assistance with respect to *trial* counsel, failed to exhaust the claim that his appellate counsel was ineffective. *Id.* at 33, 124 S.Ct. 1347 (emphasis added). However, the Court declined to reach the petitioner's second argument—that he did not need to indicate the claim's federal nature because the standards for adjudicating the state and federal law claims were identical. *See id.* at 33–34, 124 S.Ct. 1347. Under those circumstances, petitioner argued, he had "necessarily" fairly presented the federal claim when presenting the state claim. *Id.* at 33, 124 S.Ct. 1347. "[W]ithout expressing any view on the merits of the issue," the Court deemed the argument waived because it had only been raised for the first time in petitioner's merits brief to the Court.[2] *Id.* at 34, 124 S.Ct. 1347.

The question *Baldwin* left open is now before us: Where state and federal claims share the same legal standard, has a federal claim been "fairly presented" when the state court necessarily rejects the federal claim in ruling on the state claim?[3] In his brief to the Appellate Division, Jackson relied on state law to argue that the trial court erred in refusing to instruct the jury on the defense of justification because, on a reasonable view of the evidence, the factfinder might have decided his actions were justified. *See People v. Padgett*, 60 N.Y.2d 142, 468 N.Y.S.2d 854, 456 N.E.2d 795 (1983); N.Y. Penal Law § 35.15(2). The Appellate Division, in turn, held that "[c]ontrary to the defendant's contention, no reasonable view of the evidence supports a justification charge and, thus, the trial court properly declined to give it (*see*

---

**2.** Writing in dissent, Justice Stevens indicated that he would disregard Supreme Court Rule 15.2 and entertain the petitioner's second argument. *Baldwin*, 541 U.S. at 34, 124 S.Ct. 1347 (Stevens, J. dissenting). Because petitioner had satisfactorily demonstrated that there was "no significant difference between" the state and federal standards for ineffective assistance, he reasoned, it was "clear that the state courts did have a fair opportunity to assess respondent's federal claim." *Id.*

**3.** The Supreme Court also expressly left open this question in an analogous context when it dismissed the writ of certiorari as improvidently granted in *Howell v. Mississippi*, —— U.S. ——, 125 S.Ct. 856, 160 L.Ed.2d 873 (2005) (per curiam). There, petitioner argued that the Mississippi courts violated his Eighth and Fourteenth Amendment rights under the federal Constitution by refusing to instruct the jury about a lesser included offense in his capital case. Citing *Baldwin*, 541 U.S. at 32, 124 S.Ct. 1347, the Court concluded that petitioner's federal constitutional claim was not properly raised before the Mississippi Supreme Court for purposes of 28 U.S.C. § 1257 because "he did not cite the Constitution or even any cases directly construing it, much less any of this Court's cases." *Id.* at 858. Section 1257 requires that federal law challenges to state law decisions be "addressed by or properly presented" to the state court before the Supreme Court may hear the case. *Id.* at 860. Most important for our purposes, petitioner also claimed that he raised his federal claim "by implication" because the state-law rule on which he relied was "identical" or "virtually identical" to the federal constitutional rule established in *Beck v. Alabama*, 447 U.S. 625, 638, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980). *Id.* at 859. The Court responded that "[a]ssuming, without deciding, that identical standards might overcome a petitioner's failure to identify his claim as federal, Mississippi's rule regarding lesser-included-offense instructions is not identical to *Beck*—or at least not identical to the Mississippi Supreme Court's interpretation of *Beck*." *Id.* Thus, as in *Baldwin*, the Court again left open whether the presentation of identical or nearly identical claims in state and federal court might satisfy the requirement of "proper[] present[ation]" under Section 1257.

Penal Law § 35.15[2] )." *People v. Jackson*, 266 A.D.2d at 476, 698 N.Y.S.2d 887.

Had Jackson instead argued that the trial court's failure to charge justification denied him due process under the Fourteenth Amendment, the Appellate Division's inquiry would have been the same. As we said in *Davis v. Strack*, 270 F.3d 111, 123 (2d Cir.2001), "a finding that the petitioner was erroneously deprived of a jury instruction to which he was entitled under state law is the first step in the determination whether that error violated the petitioner's federal due process rights." This first step requires asking whether, "on any reasonable view of the evidence, the fact finder might have decided that the defendant's actions were justified" pursuant to New York Penal Law § 35.15. *Id.* at 124 (quoting *Padgett*, 60 N.Y.2d at 144–45, 468 N.Y.S.2d 854, 456 N.E.2d 795). The second step asks whether the failure to give such a charge was sufficiently harmful to make the conviction unfair. *See id.* at 124 (citing *Cupp v. Naughten*, 414 U.S. 141, 146, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973)).

In a case such as this, where the failure to instruct the jury on justification was so harmful as to deny the defendant due process, Jackson necessarily presented his due process claim when he asked the Appellate Division to find that the justification instruction should have been given. As we explain later in greater detail, *see infra* Section II.B, the failure to charge the jury on justification was nothing less than "catastrophic" for Jackson. *Davis*, 270 F.3d at 132. Jackson was deprived of a "highly credible defense" that might well have allowed the jury to acquit him not only of second degree murder, but also of second degree weapon possession. *Id.* at 131. On these facts, the trial court's denial of the justification charge rendered Jackson's conviction unfair. Thus, even if his brief to the Appellate Division did not explicitly invoke due process, it unavoidably raised the entirety of his federal claim.

We are confronted, therefore, with a situation for which the Supreme Court's application of the "fairly present" standard invites further refinement. In contrast with other situations, Jackson did not explicitly have to tell the state court that he was presenting a federal due process claim because, by raising his state law claim, he necessarily gave the Appellate Division a fair "opportunity to pass upon and correct alleged violations of [his] federal rights." *Picard*, 404 U.S. at 275, 92 S.Ct. 509 (internal quotation marks and citation omitted). Where the absence of the required justification defense so clearly deprived Jackson of due process, his state law claim was not merely "somewhat similar" to that of his federal claim; it was "virtually identical." *Duncan*, 513 U.S. at 366, 115 S.Ct. 887.

Accordingly, we hold that Jackson exhausted his federal claim because, in this case, the legal standards for his federal and state claims were so similar that by presenting his state claim, he also presented his federal claim. We turn now to the merits.

## II. Merits

Before we may affirm the grant of habeas relief, we must resolve three questions in Jackson's favor. *See Davis*, 270 F.3d at 124. First, was he entitled to a justification charge? Second, if so, did the failure to give one result in a denial of due process? Third, if so, did the state court's contrary conclusion constitute an unreasonable application of clear Supreme Court law? *See* 28 U.S.C. § 2254.

### A. Was a justification charge required under New York law?

Our role "is not to interpret New York's law of justification, but to determine

whether the evidence was sufficient to warrant a justification charge under that law." *Davis*, 270 F.3d at 123–24 n. 4. New York Penal Law § 35.15 permits the use of force under the following circumstances:

1. A person may, subject to the provisions of subdivision two, use physical force upon another when and to the extent he reasonably believes such to be necessary to defend himself or a third person from what he reasonably believes to be the use or imminent use of unlawful physical force by such other person . . . .

2. A person may not use deadly physical force upon another person under circumstances specified in subdivision one unless:

 (a) He reasonably believes that such other person is using or about to use deadly physical force. Even in such case, however, the actor may not use deadly physical force if he knows that he can with complete safety as to himself and others avoid the necessity of so doing by retreating . . ., or

 (b) He reasonably believes that such other person is committing or attempting to commit a kidnapping, forcible rape, forcible sodomy or robbery; or

 (c) He reasonably believes that such other person is committing or attempting to commit a burglary, and other circumstances are such that the use of deadly physical force is authorized by subdivision three of section 35.20.

N.Y. Penal Law § 35.15 (McKinney 1997). New York Penal Law § 35.20 provides, in relevant part:

3. A person in possession or control of, or licensed or privileged to be in, a dwelling or an occupied building, who reasonably believes that another person is committing or attempt-ing to commit a burglary of such dwelling or building, may use deadly physical force upon such other person when he reasonably believes such to be necessary to prevent or terminate the commission or attempted commission of such burglary.

N.Y. Penal Law § 35.20 (McKinney 1997). The term "deadly physical force" is defined as "physical force which, under the circumstances in which it is used, is readily capable of causing death or other serious physical injury." N.Y. Penal Law § 10.00(11).

 Justification in New York is a defense, not an affirmative defense; "therefore, when the defense is raised on a proper evidentiary record, the People bear the burden of disproving it beyond a reasonable doubt." *Davis*, 270 F.3d at 124 (citing N.Y. Penal Law §§ 25.00(1), 35.00); *In re Y.K.*, 87 N.Y.2d 430, 433, 639 N.Y.S.2d 1001, 663 N.E.2d 313 (1996); *see also People v. McManus*, 67 N.Y.2d 541, 546–47, 505 N.Y.S.2d 43, 496 N.E.2d 202 (1986) ("whenever justification is sufficiently interposed by the defendant, the People must prove its absence to the same degree as any element of the crime charged"). A justification charge is warranted, "if on any reasonable view of the evidence, the fact finder might have decided that defendant's actions were justified." *Padgett*, 60 N.Y.2d at 145, 468 N.Y.S.2d 854, 456 N.E.2d 795; *see also Davis*, 270 F.3d at 124. The New York Court of Appeals has "rejected a restrictive application of the defense." *McManus*, 67 N.Y.2d at 547, 505 N.Y.S.2d 43, 496 N.E.2d 202. In determining whether the evidence warrants a justification charge, the reviewing court must view the record in the light most favorable to the defendant. *See McManus*, 67 N.Y.2d at 549, 505 N.Y.S.2d 43, 496 N.E.2d 202; *Padgett*, 60 N.Y.2d at

144–45, 468 N.Y.S.2d 854, 456 N.E.2d 795; *People v. Watts*, 57 N.Y.2d 299, 301, 456 N.Y.S.2d 677, 442 N.E.2d 1188 (1982).

 The leading New York cases construing the justification defense, *see Y.K.*, 87 N.Y.2d at 430, 639 N.Y.S.2d 1001, 663 N.E.2d 313; *People v. Goetz*, 68 N.Y.2d 96, 506 N.Y.S.2d 18, 497 N.E.2d 41 (1986), establish a subjective and an objective component: The fact-finder must determine that the defendant believed deadly physical force was necessary and that a reasonable person would have believed the use of deadly physical force was necessary under the same circumstances. *See Y.K.*, 87 N.Y.2d at 433–34, 639 N.Y.S.2d 1001, 663 N.E.2d 313; *Goetz*, 68 N.Y.2d at 114–15, 506 N.Y.S.2d 18, 497 N.E.2d 41. New York law also imposes a duty to retreat in some circumstances: If a defendant who is confronted with deadly physical force knows he can retreat with complete safety but fails to do so, the justification defense is lost. *See Y.K.*, 87 N.Y.2d at 434, 639 N.Y.S.2d 1001, 663 N.E.2d 313; N.Y. Penal Law § 35.15(2)(a). Significantly, one is not required to retreat when using deadly force to defend against a robbery, *see Goetz*, 68 N.Y.2d at 106 n. 5, 506 N.Y.S.2d 18, 497 N.E.2d 41; N.Y. Penal Law § 35.15(2)(b), and the statute does not appear to impose that duty with respect to defense against a burglary. *See* N.Y. Penal Law §§ 35.15(2)(b), 35.20(3).

 Jackson argues that, viewing the evidence in the light most favorable to him, a jury could have found that his use of deadly force was justified on three possible theories: (1) that he reasonably believed Brown was attempting to take the keys from him by force, thus committing a robbery, *see* N.Y. Penal Law § 35.15(2)(b); N.Y. Penal Law § 160.00 ("Robbery is forcible stealing."); (2) that he reasonably believed Brown was attempting to enter apartment 2E with the intent of robbing him of the keys, thus committing a burgla-

ry; *see* N.Y. Penal Law §§ 35.15(2)(c), 35.20(3); N.Y. Penal Law § 140.20 ("A person is guilty of burglary in the third degree when he knowingly enters or remains unlawfully in a building with intent to commit a crime therein."); or (3) that he reasonably believed deadly force was necessary to protect himself from the imminent use of deadly force against him, and he could not retreat. N.Y. Penal Law § 35.15(2)(a).

The District Court held that a jury could have found that Jackson's use of deadly force was justified under either of the first two theories, and thereby concluded that Jackson was entitled to the justification instruction under New York law. *See Jackson*, 296 F.Supp.2d at 301–02 ("From the testimony and evidence presented at petitioner's trial, a jury could have concluded that petitioner reasonably believed that Brown was attempting to take the keys by force from him—that is, attempting to commit a robbery. Alternatively, a jury could have decided that petitioner reasonably believed Brown was attempting to enter apartment 2E with the intent to take the keys from petitioner—attempting to commit a burglary—and the requirements of section 35.20 for the use of deadly physical force were otherwise met.") (internal citations omitted).

The State contends that a justification charge was unwarranted because, in its view, the evidence did not establish that the use of deadly force was "necessary" to repel a robbery or burglary. N.Y. Penal Law §§ 35.15(1); 35.20(3); *see also Goetz*, 68 N.Y.2d at 106 n. 5, 506 N.Y.S.2d 18, 497 N.E.2d 41 (noting that the "necessity" requirement of § 35.15(1) "applies to all uses of force under section 35.15"). The State cites several New York cases holding that a defendant was not entitled to a justification charge because the evidence failed to establish that the defendant reasonably be-

lieved deadly force was necessary. *See, e.g., People v. Cox,* 92 N.Y.2d at 1005, 684 N.Y.S.2d 473, 707 N.E.2d 428 (1998) (upholding denial of justification charge in case of burglary because defendant "had ample opportunity to terminate the alleged burglary by means not requiring deadly force"); *People v. Vecchio,* 240 A.D.2d 854, 855, 658 N.Y.S.2d 720, 721 (3rd Dep't 1997) (defendant's request for justification charge was properly denied because "[defendant's] use of a dangerous instrument against an unarmed individual cannot be viewed as anything other than an excessive use of force, thereby precluding the defense of justification"). The State contends that it would have been unreasonable for Jackson to believe that shooting Brown was the only way to defend against a possible robbery or burglary since he could, for example, have either struck Brown or warned Brown that he had a gun.

We disagree. Viewing the evidence in the light most favorable to Jackson, a jury could have concluded that he reasonably believed the use of deadly physical force was required to defend against a robbery by Brown. The evidence established that a severely inebriated Brown, supported by a hostile crowd, charged up to apartment 2E to take the Halls' keys from Jackson. Ula Hall told Brown to "leave it alone" and "forget it," and even Brown's own wife and sister pleaded with him to stop arguing with Jackson. Nevertheless, Brown insisted that Jackson "[g]ive her the fucking keys," and proceeded to attempt to take them by force. Natalie Hall testified that she saw Brown raise his hands and push Jackson, and Brown's nephew initially told police that a "fist fight" occurred between his uncle and Jackson. Patricia Drummond testified that she saw Brown punch Jackson twice, knocking him to the ground. In his videotaped confession, Jackson contended that a drunken Brown, without provocation and in the midst of a threatening crowd that included friends and relatives who had also been drinking, attacked him, punching him twice in the face. Presented with these facts, a jury could have concluded that Jackson—who was under no legal obligation to retreat if he thought Brown was about to rob him—believed that simply striking back or announcing that he had a gun would not have prevented the robbery and that he was required to use his weapon. The jury also could have found that, under these circumstances, a reasonable person would have come to the same conclusion.

Because Jackson was clearly entitled to a justification instruction pursuant to a robbery theory, N.Y. Penal Law § 35.15(2), the Appellate Division erred in concluding that "no reasonable view of the evidence supports a justification charge." *People v. Jackson,* 266 A.D.2d at 476, 698 N.Y.S.2d 887 (1999).

### B. Did the failure to give the requested charge result in a denial of due process?

Having identified an error of state law, we are now required to consider whether there was a violation of federal law. *See Estelle v. McGuire,* 502 U.S. 62, 67–68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991). The inquiry is whether the trial court's refusal to give the justification instruction "so infected the entire trial that the resulting conviction violates due process." *Cupp v. Naughten,* 414 U.S. 141, 147, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973). This occurs when the denial of a justification instruction was "sufficiently harmful to make the conviction unfair." *Davis,* 270 F.3d at 124; *see also Duckett v. Godinez,* 67 F.3d 734, 746 (9th Cir.1995) (asking whether trial court's refusal to give requested instruction rendered the trial "fundamentally unfair"); *Means v. Solem,* 646 F.2d 322, 332 (8th Cir.1980) (granting

habeas relief where trial court's refusal to instruct the jury on self-defense was an error of "constitutional magnitude").

In *Davis*, we held that the trial court's failure to give a justification instruction in the petitioner's trial for second degree murder violated due process and entitled the petitioner to habeas relief because the omission was nothing less than "catastrophic." 270 F.3d at 132. The error was of "immense importance" because *Davis* was "not a case of a minor error of state law in explaining the legal standards to the jury." *Id.* Nor was it "a case of a refusal to instruct on a fantastic, improbable defense that the jury was unlikely to adopt." *Id.* Instead, the failure to instruct the jury on justification deprived Davis, who had confessed to the shooting, of a "highly credible defense" to homicide. *See id.* at 131.

▉ We agree with the District Court that with respect to whether the failure to charge the jury on justification constituted a violation of due process, Jackson's case is not "different [from *Davis* ] in any significant respect." *Jackson*, 296 F.Supp.2d at 302. As in *Davis*, the evidence could have allowed a jury to conclude that Jackson acted justifiedly and thus to acquit him of all homicide charges.[4] However, in the face of Jackson's confession, the jury could not acquit without having been instructed on justification. That the jury convicted Jackson of second degree manslaughter rather than second degree murder on the basis of his counsel's alternative argument that the shooting was accidental suggests that the jury was, in fact, open to crediting Jackson's version of events.[5] "Taking all

this into account, there is a substantial likelihood that a properly instructed jury would have found in [Jackson's] favor on the homicide charge." *Davis*, 270 F.3d at 131. As we said in *Davis*, to deny a defendant the opportunity to raise a "highly credible defense" to a charge of homicide is nothing short of a "catastrophic" error. *Id.* at 131–32.

The State argues that a different result is compelled by *Blazic v. Henderson*, 900 F.2d 534 (2d Cir.1990), where we held that although the state court erred under New York law in failing to give a justification instruction, the error did not violate due process because it "would not have affected the jury's verdict," *id.* at 542. Our case differs from *Blazic* in two critical respects. First, in explaining in *Blazic* why the failure to give a justification instruction was harmless error, we said:

> Nor do we think a justification charge would have affected the outcome if a jury found that the prosecution proved all the elements of second degree murder and a jury proceeded to a self-defense claim. For a jury to find that the prosecution met its burden, [it] would have had to reject significant aspects of Blazic's account. Certainly, if a jury rejected the majority of Blazic's testimony, a justification charge would not have affected the jury's verdict since [the] testimony was the only evidence supporting a justification claim.

*Id.* at 542–43. While Blazic's own testimony was the only evidence supporting a justification charge, Jackson's claim relies not on his own testimony—he did not testi-

---

4. Under New York law, a defendant whose actions are found to have been justified is not guilty of homicide. *See McManus*, 67 N.Y.2d at 545, 505 N.Y.S.2d 43, 496 N.E.2d 202 ("Justification does not make a criminal use of force lawful; if the use of force is justified, it cannot be criminal at all.").

5. *See Henderson v. Kibbe*, 431 U.S. 145, 156, 97 S.Ct. 1730, 52 L.Ed.2d 203 (1977) ("[It is] logical to assume that the jurors would have responded to an instruction [that was not given] consistently with their determination of the issues that were comprehensively explained.").

fy at the trial—but rather on the statements and testimony of numerous witnesses, including state witnesses, as well as on his videotaped confession. This evidence would have provided ample grounds for a jury to credit Jackson's justification defense, even if it found that the prosecution otherwise met its burden. Second, the jury convicted *Blazic* of second degree murder, necessarily suggesting that Blazic intended to commit murder. *See id.* at 542–43. But Jackson's jury acquitted him of second degree murder while convicting him of the lesser offense of second degree manslaughter, which only required a showing that Jackson "recklessly" caused Brown's death. N.Y. Penal Law § 125.15. In sharp contrast to *Blazic*, the probabilities are substantial that, if given a justification charge, Jackson's jury might well have acquitted. As in *Davis*, therefore, the failure to charge Jackson was "an error of immense importance" that so infected the entire trial as to deny due process. 270 F.3d at 132.

In holding that the trial court's failure to instruct the jury on justification "infected the entire trial," we find that it tainted not only the jury's consideration of the homicide charge, but also its evaluation of the weapons possession charge. The weapons possession statute provides: "A person is guilty of criminal possession of a weapon in the second degree when, with intent to use the same unlawfully against another ... [h]e possesses a loaded firearm." N.Y. Penal Law § 265.03 (McKinney 1997).

 Under New York law, justification under Section 35.15 is not a defense to second degree criminal possession of a weapon. *See People v. Pons*, 68 N.Y.2d 264, 265, 508 N.Y.S.2d 403, 501 N.E.2d 11 (1986). Whereas the defense of justification excuses the use of physical force in the context of a homicide, it is the act of possessing a weapon with intent to use it unlawfully, not the actual use of the weapon, that is at the heart of a weapons possession offense. *See Pons*, 68 N.Y.2d at 267, 508 N.Y.S.2d 403, 501 N.E.2d 11. Thus, "it does not follow that because defendant was justified in the actual shooting of the weapon under the particular circumstances existing at that moment, he lacked the intent to use the weapon unlawfully during the continuum of time that he possessed it prior to the shooting." *Pons*, 68 N.Y.2d at 267–68, 508 N.Y.S.2d 403, 501 N.E.2d 11; *see also Davis*, 270 F.3d at 134 (explaining that under the rule in *Pons*, "[a] defendant may use his illegally possessed gun only in a manner that falls within the protection of the justification statute and nonetheless be guilty of criminal possession, second degree ... because, regardless that his actual, ultimate use of the gun might not have been unlawful (because it was justified under § 35.15), he may have harbored intentions to use the gun in other circumstances that would have been unlawful.").

 That New York law does not recognize the defense of justification with respect to a weapons possession charge does not, however, mean that the trial court's erroneous refusal to give a justification instruction with respect to the *homicide* charge did not fatally taint Jackson's weapons possession conviction. The District Court observed, we think correctly, that "a properly instructed jury, if it found [Jackson] not guilty of the homicide charge, might further conclude that ... [he] was undeserving of punishment altogether." *Jackson*, 296 F.Supp.2d at 305. More specifically, a jury that believed it had little choice under the law but to find Jackson guilty of second degree manslaughter—because it had not been instructed on justification—might also have believed that it had little choice but to find him guilty of second degree weapons pos-

session. If Jackson intended his actions, and if those actions were unlawful because they were reckless—leading to the manslaughter conviction—then Jackson by definition intended to use the gun unlawfully. The finding that Jackson was guilty of second degree manslaughter may thus have *compelled* the finding that he was guilty of second degree weapons possession.

By contrast, if a properly instructed jury were to have concluded that Jackson was not guilty of any homicide offense, then it might have also concluded that he lacked the requisite intent to be guilty of the weapons charge. There was, after all, no other evidence that he intended to use the weapon unlawfully "during the continuum of time that he possessed it prior to the shooting."[6] *Pons*, 68 N.Y.2d at 268, 508 N.Y.S.2d 403, 501 N.E.2d 11. Indeed, the evidence suggests that Jackson, a building superintendent in Brooklyn, only carried the gun after dark for protection from drug dealers and intruders and that the altercation occurred when he was attempting to secure an apartment from unauthorized use. Thus, there is ample reason to believe that if the jury had been instructed on the defense of justification with respect to the homicide count, it might well have found Jackson guilty only of fourth degree criminal possession (possession of a firearm), N.Y. Penal Law § 265.01 (McKinney 1997), but not of second degree criminal possession, which requires intent to use the weapon unlawfully. N.Y. Penal Law § 265.03 (McKinney 1997).

In sum, we find that the trial court's failure to instruct the jury on the defense of justification with respect to the homicide count infected both of Jackson's convictions.

### C. Is the state court's error remediable by habeas corpus?

■ AEDPA provides that federal courts may not grant habeas corpus relief to state prisoners with respect to any claim that was adjudicated on the merits in state court proceedings unless "the adjudication of the claim (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *Williams v. Taylor*, 529 U.S. 362, 404–05, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). The Supreme Court explained in *Williams* that a state court decision constitutes an "unreasonable application of" clearly established federal law under the first prong of Section 2254(d) if it "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case." *Id.* at 407–08, 120 S.Ct. 1495.

In holding that New York law did not require granting Jackson's request for a justification instruction, the state court unreasonably applied *Cupp* which, as indicated, requires us to ask whether the refusal to give the instruction "so infected the entire trial that the resulting conviction violates due process." 414 U.S. at 147, 94 S.Ct. 396. "On the basis of the evidence presented, [Jackson] had a clear right under New York law to have the jury consider his defense, and the trial in which he was denied that right was egregiously at odds with the standards of due process

---

**6.** In this way, the instant case is factually distinguishable from *Davis*, where the petitioner obtained a gun and walked around with it the evening of the shooting because, as

he testified, he "wasn't going to let [his prior assailant] hurt [him] again." *Davis*, 270 F.3d at 119.

propounded by the Supreme Court in *Cupp.*" *Davis,* 270 F.3d at 133.

■ We conclude that the state court's error constitutes an unreasonable application of *Cupp* not only with respect to the homicide count, but also with respect to the weapons possession count. To be sure, *Davis* contains language that might be read to suggest a different result. But the facts of *Davis* are materially different than those before us. In that case, while we acknowledged that a properly instructed jury "might have determined that the People had failed to prove the essential element of intent to use the gun unlawfully," *Davis,* 270 F.3d at 134, we essentially treated the petitioner's claim as though it were seeking a justification charge with respect to the weapons count—a charge *Pons* precludes. Consequently, we concluded that "[g]iven the fact that justification under § 35.15 is not a defense to criminal weapon possession, second degree, the denial of the instruction did not, with respect to the possession charge, violate clearly established Federal law, as determined by the Supreme Court." *Id.* at 134–35 (internal quotations and citation omitted). In short, we could not say that *Cupp* clearly required giving a justification instruction that state law precluded.

Our case is different. Jackson's weapons possession conviction must fall not because he was entitled to a justification instruction with respect to that count—under *Pons,* he clearly was not—but because he was entitled to an instruction with respect to the homicide count. As we explained, the trial court's failure to give the requested instruction in defense of the homicide count "so infected the entire trial" that both convictions were tainted. This single error constituted an unreasonable application of clearly established Su-

preme Court precedent, entitling Jackson to habeas relief.

## CONCLUSION

Accordingly, the judgment of the District Court is AFFIRMED.