Filed 9/18/14

CERTIFIED FOR PARTIAL PUBLICATION[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E058212 |
| v. | (Super.Ct.No. RIF1202797) |
| BRYAN ALEXANDER WATT, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County. Michael B. Donner, Judge. Affirmed in part; reversed in part with directions.

Joshua H. Schraer, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Charles C. Ragland and Parag Agrawal, Deputy Attorneys General, for Plaintiff and Respondent.

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts 1 and 3.

A jury convicted defendant, Bryan Watt, of receiving stolen property (Pen. Code, § 496, subd. (a))[1] and he was granted probation. He appeals, claiming there was insufficient evidence to support the verdict, the jury was misinstructed and two of his probation terms are invalid. We disagree with his first two contentions, agree with the third, and, therefore, strike the probation terms at issue while affirming the remainder of the judgment. The facts are reported in connection with the first issue discussed.

1. *Insufficient Evidence of Knowledge that the Property Was Stolen and that Defendant Possessed the Property*

The next door neighbor of the victim's property testified that around 7:30 or 8:00 a.m. on March 24, 2012, he saw drag marks coming out of the gate that marked the entry to the victim's property and followed the marks down the hill one-fourth of a mile to defendant's truck, where defendant was attempting to hoist a piece of irrigation equipment onto its bed. The neighbor asked the man what he was doing with the piece of equipment, but the neighbor did not say what defendant said in response. The neighbor then called the property manager and asked him to come to the property and "take over." The neighbor had not seen the piece of equipment at the side of the road in that spot before and he had never seen it "just hanging out on the side of the road." There were no "No Trespassing" signs in the area where defendant's truck and the piece of equipment that was being hoisted onto the rock were located.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

2

The manager of the victim's property testified that around 7:00 a.m. on March 24, 2013, he received a call from the above-mentioned neighbor who reported that someone was leaving the victim's property with a piece of metal from the property. When the manager arrived, he saw defendant, who was standing next to the neighbor, and defendant's truck in the middle of a public road one-half to three-quarters of a mile from the gate that marked the entry to the victim's property. The gate had two "No Trespassing" signs, a chain and two locks on it. One of the links in the chain had been freshly cut, although the gate was closed when the manager arrived. The working piece of irrigation equipment, which the manager testified had come from the victim's property, weighed about 3,000 pounds, and was three and one-half to four feet in diameter, had been hoisted up by a chain in preparation for being loaded onto defendant's truck. There were marks created by dragging the piece of equipment from where it had been kept on the victim's property,[2] at an elevation of about 800 to 1000 feet, which was three-quarters to one mile from defendant's truck and at least one-half mile from the gate, up the only road that went through that property, to the back of defendant's truck. Going through the gate was the only way to get to where the piece of equipment had been kept. In front of where the piece of equipment had been kept was a water tank that had fresh cut marks in it, a "used-up" saw blade, used for cutting steel, a sign that read, "Private

---

[2] He testified that the drag marks and where the piece of equipment had been kept started three-quarters of the way up the mountain, almost to its top. The road towards the top was passable only by a pickup or four wheel drive.

3

Property" which was off its post and lying on the ground and a blue tarp. The manager opined that the saw blade was the type that was used in the kind of saw which was in the bed of defendant's truck and the blade might have fit that saw, which cuts steel. The manager, who had last been to the property a month before, had not seen the saw blade, the cuts to the tank nor the tarp before March 24, 2012. Also in the bed of defendant's truck were three pieces of airstrip landing metal, weighing a total of 150 to 200 pounds. The landing strip metal had been kept on the victim's property, beyond the gate, one-half mile from where defendant's truck was parked and it was accessible by the road that ran between the gate and where the piece of equipment had been kept and the tank was located. The landing strip metal had been used to block trails to keep people off the victim's property. The property manager had not given defendant permission to be on the property or to take anything from it. There were more than 12 "No Trespassing" signs posted throughout the victim's 182 acre property.

The owner of the property testified that no one, including defendant, had permission to be on the property on March 24, 2012 or to take anything from it, including the piece of equipment and the airstrip landing metal. A representative of the company that manufactured the piece of equipment testified that it cost $35,000 brand new and half that used.

A deputy sheriff testified that he arrived at the property at 8:11 a.m. on March 24, 2012, and saw the piece of equipment chained to the hoist. He spoke to the property manager who "explain[ed] to [him] what had happened[,]"the officer "questioned [the

4

manager] thoroughly about the incident" and defendant told him that he tried to buy the piece of equipment from the manager. The officer testified that the manager had not told him about the link in the chain being cut or finding the used saw blade near the tank. At some point that day, which was not specified, the officer also spoke to the neighbor. After completing his investigation, the officer arrested defendant, who did not attempt to flee, was cooperative and did not appear to be evasive. The officer testified that the blade on defendant's saw was for cutting metal, not concrete. He said that he had never seen people riding BMX bikes in the area at 6:00 or 7:00 a.m. and riders normally rode in the afternoon.

Defendant testified that a woman at a market near his home and 10 minutes from the victim's property, whose last name he did not know, had told him that there was metal on a hill where defendant first parked his truck on March 23, 2012.[3] Defendant planned to pick up the metal and turn it into the scrap yard for money, so he could buy gas to get to his work site in Santa Barbara the next work day. There was a BMX track that his son used on the other side of the street where he eventually parked his truck and he had been to that track four to five times before. At 6:00 or 7:00 a.m., or while it was light, he parked his truck in the desert, around the mountain from where he later parked, and hiked 100 feet up the mountain on a dirt bike trail where he found the pieces of

---

[3] When defendant first testified, he said the woman had sent him to a hill "off Leon [Street] . . . and by the new school. However, where defendant later in his testimony indicated he had first gone was nowhere near Leon Street.

5

landing strip metal, as well as a tire, beer cans and bundled barbed wire, which he thought was scrap. It did not appear to him that he was on someone's property—in fact, he thought he was on Bureau of Land Management land, which, he said was "for public use"—and he saw no "No Trespassing" signs. He threw the tire and the landing strip metal down the hill and loaded them into the bed of his truck. He then drove his truck around to the BMX track to see if his son and the son's friends were there[4] and he saw the piece of equipment on the side of the public road, with no signs near it. He saw the drag marks leading up to the piece of equipment and it appeared to him that someone had drug it "down the hill or something" to there and abandoned it. He planned to load it into the bed of his truck and use it to get gas money—he expected to collect about $400 for it. He denied seeing the gate at the entrance to the victim's property and he denied driving past it. He was in the process of loading the piece of equipment into the bed of his truck when the neighbor arrived and said he thought it belonged to the property manager. Defendant told the neighbor he had just found it and he would call the property manager and see if he could buy it from him. The neighbor said he would call the property manager to come out or defendant told the neighbor to call him. The neighbor left and defendant waited two to three hours for the property manager to show up. When he did, he was very angry and he immediately told defendant that the latter was going to jail and the police were on their way. Defendant asked the manager if he could buy the piece of

---

[4] He testified after the police officer did that he expected to see his son at the BMX area around 8:00 or 9:00 a.m.

equipment and he did not know that it had not been abandoned and it was "laying out . . . in the field." The property manager replied in the negative and reasserted that defendant was going to jail. An hour later, the deputy sheriff arrived and asked defendant what he was doing there. Defendant denied at trial entering the gate, seeing the "No Trespassing" signs on it, dragging the piece of equipment from the victim's property to where his truck was parked or going any further up the hill towards the gate than where his truck was parked. He denied that his truck, a 1995 Dodge with 256,000 miles on it, was capable of dragging the piece of equipment down to where he was trying to get it into his truck. He testified that the saw in his truck was a concrete saw which he used for his work and whose blade could not cut metal. He denied seeing the tank or making cuts in it on March 24, 2012 and he said the saw he had in his truck could not have made those cuts. He did not recognize the saw blade that had been found near the tank. He did not believe that the piece of equipment and the landing strip metal belonged to someone else—he believed that they had been dumped where he found them and abandoned.

As already stated, defendant testified to a number of statements he made to the neighbor and the property manager that tended to exculpate him, however, there was no corroboration by these witnesses that he made any of these statements. Other portions of defendant's story directly conflicted with the testimony of all three prosecution witnesses. Defendant's timeline, including his claims of waiting two to three hours for the property manager to appear at the scene and another hour for the deputy sheriff to appear, contradict the testimony of all three that they met up with defendant before 8:15 a.m.

7

Defendant also claimed that he waited alone for the property manager to arrive, yet the property manager testified that when he arrived, the neighbor was standing next to defendant. Defendant's description of where the lady at the store recommended he go to pick up scrap metal differed from where he testified he actually went. Defendant claimed that the piece of equipment was at the side of the public road, yet the neighbor testified that he did not see it there and both he and the property manager testified that the drag marks went from the area at the gate to the back of defendant's pickup truck, which would not have been possible had defendant found the piece of equipment at the side of the road. Defendant testified that he told the property manager that he found the piece of equipment "laying out here in the field" yet he testified repeatedly at trial that he found it at the side of the public road. Defendant claimed the blade in his saw was for cutting concrete, while the deputy sheriff testified it was for cutting metal. Defendant's and the officer's testimony conflicted about when people rode BMXs in the area. Defendant claimed he found the landing strip metal and tire in a different place than the property manager testified the former was kept. Defendant testified on direct examination that he threw the landing strip metal down the hill, however, after the manager testified that it weighed 150 to 200 pounds, defendant changed his testimony and said he rolled it three or four times down the hill. According to the manager, defendant could not have gotten to where the landing strip metal was by going the way he testified he had, nor could he have driven to where he claimed he parked and picked up the landing strip metal or from there to where he parked on the public road and saw the piece of equipment in the

8

manner he testified he did. In fact, the trial court at sentencing said to defendant, "I found your testimony to be absolutely unbelievable [in] many respects."

In asserting that there is insufficient evidence that defendant knew the airstrip landing metal and the piece of equipment were stolen, defendant insists that we accept as gospel truth his testimony that he believed he was on public land when he found both of the items, believed both had been abandoned and attempted to purchase them from the property manager when he was disabused of these beliefs by the latter. However, given the conflict between his story and that of the other witnesses, we are compelled to disbelieve the defendant's version, and the jury and the trial judge said as much. On the other hand, defendant admitted that he saw the drag marks leading up to the piece of equipment. A better piece of circumstantial evidence that the item had been moved by someone who was not authorized to move it could not be found. Defendant recognizes that "possession of stolen property, accompanied by . . . suspicious circumstances . . . will justify an inference that the goods were received with knowledge that they had been stolen." (*People v. Perez* (1974) 40 Cal.App.3d 795, 799 overruled on other grounds in *People v. Allen* (1999) 21 Cal.4th 846, 863.) The drag marks are such circumstances, especially when coupled with defendant's familiarity with the area, having been there a number of times before to watch his son at the BMX track. Certainly, defendant could have assumed that someone dragged the piece of equipment to where he saw it and abandoned it there. However, what did that say about the relationship between that person and the piece of equipment? Does the rightful owner of an item drag it to a place

where other people have access to it and can take it?  Although some rightful owners abandon their property, defendant believed the item was worth at least $400 as scrap metal.  Therefore, the jury could reasonably conclude that defendant knew the item was stolen.  As to the pieces of landing strip metal, defendant, himself, admitted that they were on land he believed belong to the Bureau of Land Management.  Few among us would feel at liberty to remove something that was on federal land and the jury was free to reach this reasonable inference or to conclude, in fact, that defendant had taken the metal, knowing that it, like the piece of equipment, had been stolen, or that he had actually taken it from the victim's property.[5]

Defendant also asserts that there is insufficient evidence that he "took possession and control of" the piece of equipment, apparently conceding that sufficient evidence supports this in regard to the landing strip metal.  However, the fact remains that the chains of defendant's chain hoist devise were secured around the piece of equipment.  Much like someone who is in the process of kidnapping a dog and had their own collar and leash on the dog, defendant cannot now claim that he did not take possession and

---

[5]  The fact that the jury found defendant not guilty of grand theft as charged in the Information does not foreclose the latter conclusion.  The prosecutor elected to require the jury to conclude that defendant stole *both* the piece of equipment *and* the landing strip metal in order to convict him of the charged grand theft.  In acquitting defendant, the jury could have indicated that it entertained a reasonable doubt that defendant took the piece of equipment with the intent of permanently depriving the victim of it, but not the landing strip metal.

control of the piece of equipment when he secured the chains of his chain hoist devise around it, in anticipation of lifting and placing it into the bed of his truck.

Defendant asserts that his failure to successfully hoist the piece of equipment into the bed of his truck means that there was insufficient evidence of possession and control. We disagree. In the early morning hours, when no one else was around, defendant, as he himself admits, "tried to lift the [piece of equipment] into his truck, but it was too heavy. . . . [He then] wrapped . . . chains around a rock and tried to hoist [the piece of equipment] . . . into his truck" using a hoisting device capable of pulling, according solely to defendant, less poundage than the piece of equipment weighed. As defendant concedes, the neighbor testified that defendant was trying to hoist it into the bed of his truck. When the property manager arrived, he saw, as defendant concedes, "the [piece of equipment] propped up on a rock with a chain hoisted around it. [¶] . . . [¶] [T]he record reveals that [defendant] was attempting to hoist the [piece of equipment] into the back of his truck when [the neighbor] drove by him . . . ." That's possession and control. The fact that defendant testified that his "pull-chain hoist thing" was only capable of lifting 2200 pounds and the piece of equipment weighed 3000 pounds, therefore he would have been unsuccessful in getting it into the bed of his truck, does not overcome the finding that he had possession and control. First, there is no requirement that the defendant place the object within his property in order to gain possession and control. As we have already concluded, defendant took possession and control when he secured the chains of his chain hoist device around the piece of equipment. Second, defendant, once

11

again, requires us to accept as gospel truth his testimony that his device was not capable of lifting the piece of equipment onto the bed of his truck. Under the circumstances, we are unwilling to do this. Finally, defendant candidly admits that he cannot locate a case holding that the failure to load a heavy item into the defendant's property undermines a finding of possession and control.

As to defendant's assertion that once he learned that the piece of equipment belonged to someone, he immediately stopped his efforts to move it onto the bed of his truck and directed the neighbor to call the manager so he could buy it from him. That version was based entirely on defendant's self-serving, completely uncorroborated testimony that the jury was free to reject the evidence, and did so.

2. *Jury Instruction*

Defendant contends that the trial court erred in instructing the jury, at the request of both parties,[6] that defendant would not be guilty of receiving stolen property if he believed that the piece of equipment and the runway metal were dumped only if that belief was reasonable. Specifically, the jury was instructed with a modified version of CALCRIM No. 3406, which provided, in pertinent part, "The defendant is not guilty of . . . receiving stolen property if he . . . did not have the intent or mental state required to commit the crime because he reasonably did not know a fact or reasonably and mistakenly believed a fact. [¶] If the defendant's conduct would have been lawful under

---

[6] To foreclose a claim of incompetency of trial counsel, we will sidestep the People's argument that defendant invited the error by requesting this instruction.

12

the facts as he reasonably believed them to be, he did not commit the crime of . . . receiving stolen property. If you find that the defendant believed that the [piece of equipment] and pieces of [runway metal] were dumped, and if you find that belief was reasonable, he did not have the specific intent or mental state required for the crime of . . . receiving stolen property. [¶] If you have a reasonable doubt about whether the defendant had the specific intent or mental state required for the crime[] of . . . receiving stolen property, you must find him not guilty of th[at] crime[.]"

The instructions given on the receiving stolen property charge required that defendant "have knowledge at the time he concealed or withheld the property that it had been stolen" in order for him to be guilty.

The use note for CALCRIM No. 3406 reads, in pertinent part, "If the mental state at issue is . . . knowledge, do not use the . . . language requiring the belief to be reasonable." Defendant correctly points out that we intoned this concept in dicta in *People v. Lawson* (2013) 215 Cal.App.4th 108, 115 (*Lawson*).

We begin with the observation that the jurors were never told the standard they were to apply in determining the reasonableness of defendant's belief—certainly, they were not told that it had to be objectively, rather than subjectively, reasonable. A mistake of fact must be in good faith. (*People v. Lucero* (1988) 203 Cal.App.3d 1011, 1016, 1017; *People v. Vineberg* (1981) 125 Cal.App.3d 127, 137.) In determining if a mistake of fact has negated a specific mental state, the jury may consider reasonableness in deciding if the belief was in good faith—a highly unreasonable belief can support an

13

inference of bad faith, so while objective reasonableness is not a requirement of the defense of mistake, subjective reasonableness can be a relevant consideration on the subject of good faith. (*People v. Navarro* (1979) 99 Cal.App.3d Supp. 1,11 (*Navarro*); *Vineberg*, at p. 137.)

Two cases are cited in the use note for CALCRIM No. 3406.—*People v. Reyes* (1997) 52 Cal.App.4th 975, 984, 984 footnote 6 (*Reyes*) and *People v. Russell* (2006) 144 Cal.App.4th 1415, 1425-1426 (*Russell*). In *Reyes*, the defendant's conviction of receiving stolen property was reversed because the trial court excluded expert testimony showing that he lacked knowledge that the property was stolen due to mental disorders and difficulty in cognitive functioning. (*Reyes*, at pp. 981, 986.) Additionally, despite evidence that the defendant was intoxicated with drugs when found with the victim's property, the trial court instructed the jury that voluntary intoxication was not a defense to receiving stolen property and it refused to give a defense-proffered instruction that there must exist a union of act and mental state and the latter may be shown by the circumstances surrounding the act. (*Reyes*, at pp. 985-986.)

In *Russell*, the trial court refused to instruct on mistake of fact, although the appellate court concluded that there was substantial evidence of it. (*Russell*, *supra*, 144 Cal.App.4th at p. 1431.) The defendant's conviction of receiving a stolen motor vehicle was reversed under the *Watson*[7] harmless error test, i.e, that it appears reasonably

---

[7] *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*).

probable the defendant would have obtained a more favorable outcome had the error not occurred. (*Russell*, at p. 1432.)[8] *Russell* cited *Navarro* (*id*. at p. 1427), a theft case, in which the appellate department of Superior Court held that the trial court's modification of the instruction on mistake of fact to include a requirement that the defendant's good faith belief that the property had been abandoned was reasonable constituted error. (*Navarro, supra,* 99 Cal.App.3d at pp. Supp. 1, 3, 10, 11.) The *Navarro* court reversed the conviction, without discussing the standard of error to be applied. (*Id*. at p. Supp. 11.)

Defendant cites three federal circuit court cases in which those courts concluded that the failure to instruct on a defense constituted federal constitutional error, and, therefore, he urges, "at a minimum" that we should apply the *Chapman*[9] test that the error requires reversal unless the People show beyond a reasonable doubt that it was harmless. (*Bradley v. Duncan* (9th Cir. 2002) 315 F.3d 1091; *Davis v. Strack* (2nd Cir. 2001) 270 F.3d 111; *Barker v. Yukins* (6th Cir. 1999) 199 F.3d 867.) However, in each of those cases, the appellate court concluded that the failure to instruct deprived the defendant of his right to present a defense and so infected the entire trial that it violated due process and the right to a fair trial. (*Bradley v. Duncan*, *supra*, 315 F.3d at p. 1094; *Davis v. Strack*, *supra*, 270 F.3d at p. 131; *Barker v. Yukins*, *supra*, 199 F.3d at p. 876.)

---

[8] In *Lawson*, *supra*, 215 Cal.App.4th 108, 118, this court concluded that *Russell's* holding that the trial court had a sua sponte duty to instruct on the defense of mistake of fact was no longer good law.

[9] *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*).

The same cannot be said here.  Defendant fully presented his defense and argued it to the jury and the prosecutor addressed it in his argument to the jury.  "Defendant argues a violation of state law also violates federal due process, thus mandating the more stringent standard for federal constitutional error.  He is wrong.  Mere instructional error under state law regarding how the jury should consider evidence does not violate the United States Constitution.  [Citation.]"  (*People v. Carpenter* (1997) 15 Cal. 4th 312, 393.)  The California Supreme Court has not yet determined the test of prejudice for failure to instruct on an affirmative defense.  (*People v. Salas* (2006) 37 Cal.4th 967, 984.)  However, we have not found one published opinion that embraces the *Chapman* standard for either the failure to instruct, or, as here, error in the instruction that was given.  Rather, published opinions have concluded that the *Watson* test applies.  (*People v. Breverman* (1998) 19 Cal.4th 142, 165 (*Breverman*) [failure to instruct on a lesser included offense]; *People v. Hanna* (2013) 218 Cal.App.4th 455, 462, 463 [failure to instruct on mistake of fact]; *People v. Zamani* (2010) 183 Cal.App.4th 854, 866 [same]; *People v. Villanueva* (2008) 169 Cal.App.4th 41, 52 [failure to instruct on self defense]; *Russell*, *supra*, 144 Cal.App.4th at p. 1431 [see above]; *People v. Elize* (1999) 71 Cal.App.4th 605, 616 [failure to instruct on self defense].)[10]  Even if we apply the

---

**10**  Defendant cites several cases, predating *People v. Flood* (1998) 18 Cal.4th 470, which hold that "the failure to instruct on a defense that is supported by substantial evidence requires reversal unless the factual issue posed by the erroneous instruction necessarily was decided adverse to the defendant under other, properly given, instructions."  Of course, a reviewing court examining the record to determine whether

*[footnote continued on next page]*

16

*Chapman* test, if the issue was necessarily decided under other instructions given, reversal is not required. (*People v. Johnson* (1993) 6 Cal.4th 1, 45-47.) In applying the *Watson* standard, we may look to the other instructions given, as well as whether the evidence supporting the existing judgment is so relatively strong, and the evidence supporting a different outcome is so comparatively weak, that there is no reasonable probability that the error affected the result. (*Breverman*, *supra*, 19 Cal.4th at p. 177; *People v. Wooten* (1996) 44 Cal.App.4th 1834, 1849.)

Despite the presence in this case of the requirement that defendant's belief that the landing strip metal and piece of equipment had been dumped be reasonable, and the possibility that at least one juror construed that to mean *objectively* reasonable, under other instructions given, as well as the last sentence of the disputed instruction, the jury was still required to find beyond a reasonable doubt that defendant knew the items had been stolen. Not only did the instruction at issue not foreclose the jurors from acquitting defendant if they had a reasonable doubt that defendant knew the property had been stolen, it *expressly* required the jurors to acquit him if they had such a doubt. Moreover, the evidence supporting the jury's implied finding that defendant knew the items were stolen was so relatively strong and the evidence supporting a different outcome was so comparatively weak that there is no reasonable probability that the instruction given

---

*[footnote continued from previous page]*
the jury necessarily made the finding under other instructions given is "a type of harmless error analysis." (*Id.* at p. 490.)

affected the result. Therefore, under either test, the error does not require reversal of defendant's conviction.

3. *Probation Terms*

One of the terms of defendant's probation was that he "reside at a residence approved by [his] probation officer" and "not move without the approval of [his] probation officer." Neither defendant nor defense counsel objected orally to these terms and defendant signed a sentencing memorandum, which contained the terms, in which he stated, "I have read, I understand , and I accept these terms . . . " Defendant now contends that the terms violate his constitutional right to travel and to associate freely and is improperly overbroad.

A term of probation is invalid if it '"(1) has no relationship to the crime of which the offender was convicted, (2) relates to conduct which is not in itself criminal, and (3) requires or forbids conduct which is not reasonably related to future criminality . . . ."' (*People v. Lent* (1975) 15 Cal.3d 481,486. "If a probation condition serves to rehabilitate and protect public safety, the condition may 'impinge upon a constitutional right otherwise enjoyed by the probationer, who is "not entitled to the same degree of constitutional protection as other citizens.'" [Citation.]" (*People v. O'Neil* (2008) 165 Cal.App.4th 1351, 1355 "[W]here an otherwise valid condition of probation impinges on constitutional rights, such conditions must be carefully tailored, "'reasonably related to the compelling state interest in reformation and rehabilitation . . . .'" [Citations.]" (*People v. Bauer* (1989) 211 Cal.App.3d 937, 942.)

18

The People correctly assert that the environment in which a probationer serves his probation is an important factor in whether the probation will be successfully completed. (*People v. Robinson* (1988) 199 Cal.App.3d 816, 818.) However, short of a declaration that, therefore, residency conditions are proper in *all* cases, the People offer no explanation as to how these terms are narrowly tailored to serve the state's compelling interest in rehabilitating defendant. While the state has a legitimate concern that defendant not continue to receive stolen property, this concern is addressed by the search term and the mandate that he obey all laws. Therefore, the terms are not reasonably related to the compelling state interest in reformation and rehabilitation.[11]

## DISPOSITION

The terms of defendant's probation that he reside at a residence approved by his probation officer and he not move without the approval of his probation officer are stricken. The trial court is directed to remove them from the minutes of the sentencing hearing. In all other respects, the judgment is affirmed.

CERTIFIED FOR PARTIAL PUBLICATION

RAMIREZ
P. J.


We concur:

---

[11] As the People point out, the legitimacy of these terms is currently pending before the California Supreme Court in *People v. Schaeffer* (2012) 208 Cal.App.4th 1 [145 Cal.Rptr.3d 29], review granted October 31, 2012, S205260, formerly an opinion of this court.

RICHLI

                                 J.

MILLER

                                 J.